**IN RE: The COMMITMENT OF Von Michael SHORT**

**NO. 02-16-00179-CV**

Court of Appeals of Texas, Fort Worth.

DELIVERED: June 8, 2017

ATTORNEYS FOR APPELLANT: KENNETH NASH, JAHNNA S. WARD, STATE COUNSEL FOR OFFENDERS, HUNTSVILLE, TEXAS.

ATTORNEY FOR APPELLEE: MELINDA FLETCHER, SPECIAL PROSECUTION UNIT, AMARILLO, TEXAS.

PANEL: GABRIEL, SUDDERTH, and PITTMAN, JJ.

## OPINION

MARK T. PITTMAN, JUSTICE

A jury found that Appellant Von Michael Short is a sexually violent predator (SVP), and, accordingly, the trial court ordered him to be civilly committed in accordance with Texas Health and Safety Code section 841.081. *See* Tex. Health & Safety Code Ann. § 841.081 (West Supp. 2016). In two issues, Short challenges the legal and factual sufficiency of the evidence supporting the jury's verdict. We affirm the trial court's judgment of civil commitment.

## I. Procedural History

The State of Texas filed a petition to have Short civilly committed as a SVP. *See id.* § 841.041(a) (West Supp. 2016). The State alleged that Short was a repeat sexually violent offender who had been convicted of (1) burglary by entering a habitation and attempting to commit and committing a sexual assault; (2) aggravated kidnapping and sexual assault committed during the kidnapping; (3) sexual assault at an apartment complex; and (4) attempted aggravated sexual assault of a coworker.

The matter was tried to a jury. The State called two forensic psychologists and Short as witnesses. Short testified again in his defense and also called a forensic psychologist, his sister, and three people who knew him from volunteer work they had performed through a faith-based prison program.

The jury was instructed that "[a] person is a sexually violent predator ... if the person[ ] is a repeat sexually violent offender[ ] and ... suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *See id.* § 841.023(a) (West Supp. 2016). After deliberations, a unanimous jury found beyond a reasonable doubt that Short is a SVP. In accordance with the jury's verdict, the trial court ordered Short to be civilly committed.

## II. Analysis

On appeal, Short challenges the jury's finding, arguing in his first issue that the evidence was legally insufficient to support a finding beyond a reasonable doubt that he has a behavioral abnormality because the State failed to provide any connection between his past and present behavior. In his second issue, he challenges the factual insufficiency of the evidence on the same ground.

## A. Short Preserved his Challenges to the Sufficiency of the Evidence.

 Before we consider Short's issues, we first address the State's contention that Short failed to preserve his sufficiency challenges. The State maintains that Short's complaints on appeal are not preserved because they are not the same as those he raised in his motion for new trial. We disagree.

A party may preserve sufficiency arguments by raising them in a motion for new trial. *See* Tex. R. Civ. P. 324(b) (providing that a motion for new trial is a prerequisite to complaining on appeal of factual insufficiency of the evidence to support a jury finding); *Hutchison v. Pharris*, 158 S.W.3d 554, 562 (Tex. App.—Fort Worth 2005, no pet.) (noting that a motion for new trial preserves a legal sufficiency complaint). Here, Short filed a motion for new trial asserting, among other grounds, that the State's experts "failed to show a basis for support of their opinion that [his] sexual deviance makes him likely to act on that tendency." Short further asserted that the jury's answer to question one in the jury charge was not proven beyond a reasonable doubt. That question asked the jury whether it found beyond a reasonable doubt that Short is a sexually violent predator. Short contended in his motion that he was not "shown to have engaged in a sexually violent act today, which affected his emotional and volitional capacity" and that the State's expert testimony failed to "close the analytical gap" between Short's past offenses and his sexual behavior today.

On appeal, Short makes essentially the same complaint in his sufficiency challenges—that the State did not meet its burden of proof to show that he *currently* lacks control over his own behavior and that the State failed to connect his past

behavior to his present behavior. Short's complaints in his motion for new trial were clear enough to give the trial court the opportunity to address them. *See* Tex. R. Civ. P. 321 (requiring that each point relied on in a motion for new trial "shall briefly refer to that part of the ruling of the court ... in such a way that the objection can be clearly identified and understood by the court"); *Arkoma Basin Expl. Co., Inc. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 387 (Tex. 2008) ("[T]he cardinal rule for preserving error is that an objection must be clear enough to give the trial court an opportunity to correct it."). Short therefore preserved his complaints for appeal. *See* Tex. R. Civ. P. 324(b)(2); *Hutchison*, 158 S.W.3d at 562.

## B. The Standard of Review Applied to Civil Commitment Proceedings

■ We review SVP civil commitment proceedings for legal sufficiency of the evidence using the appellate standard of review applied in criminal cases. *In re Commitment of Stuteville*, 463 S.W.3d 543, 551 (Tex. App.—Houston [1st Dist.] 2015, pet. denied); *see In re Commitment of Dever*, No. 02-16-00276-CV, 521 S.W.3d 84, 85–86, 2017 WL 1089695, at *1 (Tex. App.—Fort Worth Mar. 23, 2017, no. pet.). We assess the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find the statutory elements required for commitment beyond a reasonable doubt. *Stuteville*, 463 S.W.3d at 551.

■ When reviewing the factual sufficiency of the evidence to support the civil commitment order, we weigh all the evidence to determine "whether a verdict that is supported by legally sufficient evidence nevertheless reflects a risk of injustice that would compel ordering a new trial." *Dever*, 521 S.W.3d at 86, 2017 WL 1089695, at *1 (quoting *In re Commitment of Day*,

342 S.W.3d 193, 213 (Tex. App.—Beaumont 2011, pet. denied)). We reverse only if, after weighing the evidence, we determine that the risk of an injustice remains too great to allow the verdict to stand. *Stuteville*, 463 S.W.3d at 552 (quotation marks omitted); *see also Brooks v. State*, 323 S.W.3d 893, 895, 912 (Tex. Crim. App. 2010).

## C. SVP Civil Commitment Proceedings

Chapter 841 of the health and safety code (the SVP Act) provides a procedure for the involuntary civil commitment of a SVP. Tex. Health & Safety Code Ann. § 841.001 (West 2010). The procedure begins with the assessment of a potentially sexually violent offender before the person's release date. A person meets the criteria for an assessment if the person (1) is serving a sentence for a sexually violent offense described in the SVP Act and (2) may be a repeat sexually violent offender. *Id.* §§ 841.021(a), 841.003(b) (West Supp. 2016). A multidisciplinary team described in the SVP Act must make the assessment after receiving notice of the person's anticipated date of release from incarceration. *Id.* § 841.022(c) (West Supp. 2016). On receiving such notice, the team must (1) assess whether the person is a repeat sexually violent offender and whether the person is likely to commit a sexually violent offense after release; (2) give notice of that assessment to the Texas Department of Criminal Justice (the Department); and (3) recommend the assessment of the person for a behavioral abnormality, as appropriate. *Id.*

If the team makes such a recommendation, then, not later than the sixtieth day after the date of the recommendation, the Department must assess whether the person suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence. *Id.*

§ 841.023(a). The SVP Act defines "behavioral abnormality" as "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002 (West Supp. 2016).

To aid in the assessment, the Department must use an expert to examine the person and make a clinical assessment. *Id.* § 841.023(a). If, as a result of the assessment, the Department believes that the person suffers from a behavioral abnormality, the Department must notify the attorney representing the State for the county in which the person was most recently convicted of a sexually violent offense, and it must provide that attorney with the corresponding documentation. *Id.* § 841.023(b). That attorney may file a petition alleging that the person is a SVP. *Id.* § 841.041(a). The petition must be filed in the court of conviction for the person's most recent sexually violent offense. *Id.*

The trial court must conduct a trial to determine if the person is a SVP, and this trial must occur before the person's sentence discharge date and not later than the 270th day after the date the petition is served on the person. *Id.* § 841.061(a) (West Supp. 2016). The person and the State may request a jury trial. *Id.* § 841.061(b). The factfinder must determine whether, beyond a reasonable doubt, the person is a SVP. *Id.* § 841.062(a) (West 2010). If the matter is tried to a jury, the jury's determination must be unanimous. *Id.* § 841.062(b). If the factfinder determines that the person is a SVP,

the court must commit the person for treatment and supervision. *Id.* § 841.081(a) (West Supp. 2016). Before entering the order of civil commitment, the trial court must impose certain requirements on the person, including prohibiting the person's contact with any of the person's victims and requiring the person's participation in sex offender treatment. *Id.* § 841.082(a) (West Supp. 2016).

The commitment order is effective immediately upon entry of the order. *Id.* § 841.081(a). The treatment and supervision does not begin, however, until the person's release from a secure correctional facility. *Id.* Treatment and supervision continues until the person's behavioral abnormality has changed to the extent that the person is no longer likely to engage in a predatory act of sexual violence. *Id.*

### D. Short's Offenses

The jury heard details of Short's sexually violent offenses primarily though the testimony of Jason Dunham, a forensic psychologist [1] testifying for the State. Dr. Dunham had interviewed Short prior to trial and had reviewed Short's medical records, records about his offenses, and his prison disciplinary records. He also reviewed a manuscript Short had written and notes from other evaluations that had been performed of Short.

Short committed the offense of burglary of a habitation with intent to commit sexual assault in March 1991. The complainant, a twenty-three-year-old woman, did not know Short, but he knew who she was because he had lived in the same apartment complex. He knocked on her door, and when she opened it, he forced his way

---

1. Dr. Dunham defined forensic psychology as "essentially . . . providing psychological principles to answer legal questions." Dr. Marisa Mauro, who testified for Short, defined it as "the interaction of psychology and the law"; "using [one's] knowledge and the principles of psychology and applying those principles and that knowledge to answer questions that come out of the law."

inside her apartment. He forced her onto her bed and climbed on top of her. They struggled, and he stopped and went to get a drink of water. They sat on the couch, and he attacked her again, pushing her down onto the couch. He stopped again, seeming undecided about what he wanted to do. The complainant offered him something to drink. While he was getting the drink, she ran outside and found somewhere to call the police.

A few months later, in June 1991, Short committed aggravated kidnapping and sexual assault. Short raped the complainant three times in her car. She then faked an asthma attack and claimed she needed to go to the hospital. Short began to drive her to the hospital but then pulled over to the side of the road, raped her a fourth time, hit her head against the window, and punched her in the chest. He eventually dropped her off at the hospital and wiped his fingerprints out of the car.

The next month, Short committed another sexual offense. He went to the management office of an apartment complex and asked that the female employee working there show him the model apartment. Short did not know the woman. Once in the apartment, Short pushed her into the closet, put her in a choke hold, and raped her. Short appeared to be intoxicated at the time.

In August 1991, Short attempted to rape a coworker. The complainant and Short both worked at Home Depot but did not know each other. Short met her at a social gathering of Home Depot employees at a club. Short gave her a ride home. He was intoxicated. At some point he stopped the car and tried to kiss her. She said no and got out of the car. He followed and pulled her back to the car, and they struggled. In an attempt to escape, she grabbed his testicles. Short put his forearm across her throat and put her on top of the hood until she let go. He then forced her onto the ground. She managed to get away from him and run away.

About ten days later, Short committed the offense of false imprisonment. Short followed the complainant home from her work, and as she pulled up to her residence, he bumped into her car with his car. When they each got out of their respective cars, he pulled her into his car. He did not make any sexual advances, but she began screaming, and they struggled. Neighbors heard her screams and called the police. When the police arrived, she jumped out of Short's car. The complainant told police that Short threatened her; he denied it.

A few days later, Short was prosecuted for the burglary offense. The trial judge sentenced him to ten years' confinement for burglary of a habitation, probated for ten years. The next month, in September 1991, the trial court revoked Short's probation for reasons unrelated to his sexual offenses. That same day he pled guilty under a plea bargain to the attempted aggravated sexual assault against his coworker. The trial court sentenced him to ten years' confinement.

In October 1992, Short was convicted under a plea agreement of aggravated kidnapping and two counts of sexual assault, one for the assault committed during the kidnapping and one for the offense at the apartment complex. As part of his plea agreement, Short admitted his guilt on the false imprisonment charge, but he was not convicted of that offense. In accordance with the plea agreement, the trial court sentenced Short to twenty-five years' confinement on the kidnapping charge and twenty years' confinement for each of the sexual assaults.

E. **The Evidence is Sufficient to Support the Behavioral Abnormality Finding**

 The jury in this case heard testimony from Short and from three experts. The

experts testified about such matters as whether Short suffers from a mental disorder that makes him more likely to offend; whether Short understood his actions or had empathy for his victims; the nature of Short's offenses; Short's prison disciplinary history; whether Short has undergone sex offender treatment; and Short's likely environment upon leaving incarceration. *See Stuteville*, 463 S.W.3d at 553 (considering similar factors); *In re Commitment of Anderson*, 392 S.W.3d 878, 880 (Tex. App.—Beaumont 2013, pet. denied); *In re Commitment of Wirtz*, 451 S.W.3d 462, 466 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We conclude that the evidence was legally and factually sufficient to support the jury's finding that Short is a SVP.

**1. The Diagnosis of Short's Mental and Personality Disorders**

Both Dr. Dunham and Michael Arambula, a psychiatrist with a subspecialty in forensic psychiatry, testified that, based on an examination of Short and a review of relevant records, they had diagnosed Short with sexual deviance. More specifically, Dr. Dunham provisionally diagnosed Short with sexual sadism, and Dr. Arambula diagnosed him with unspecified paraphilia with features of sadism. Dr. Dunham also diagnosed Short with antisocial personality disorder and with "alcohol use disorder in a controlled environment," and he concluded that Short has significant psychopathic characteristics, such as lack of remorse and concern for others. Dr. Arambula had a similar opinion; he diagnosed Short with unspecified personality disorder with features of antisocial personality and a history of polysubstance dependence. Both experts described their diagnoses to the jury in detail.

Dr. Dunham explained that sexual sadism is "an extreme level of sexual arousal to … having sex with a non-consenting person." A person with sexual sadism who commits sexual assault harms the victim not merely to obtain compliance; "it's about being aroused to the physical harm that you're doing to somebody else or to the psychological suffering or the humiliation that you're inflicting on somebody else."

Dr. Dunham then explained that his diagnosis of sexual sadism was provisional because he "think[s] it's there" but could not say for sure because he did not know "what was going through [Short's] head when he was raping these women." Dr. Dunham stated that even if his provisional diagnosis of sexual sadism was incorrect, Short nevertheless showed sexual deviance and qualified for a descriptive diagnosis of sexual abuse of a nonpartner or nonspouse. He found that Short showed a sexual preoccupation; Short reported that between the ages of fifteen and twenty-three (when he became incarcerated), he had had 120 sexual partners and had had multiple affairs in his relationships.

As for the personality disorder diagnosis, Dr. Dunham explained that antisocial personality disorder is defined by "repeatedly violating the rules and norms of society" and a "[r]eckless disregard for the rights of others." Similarly, Dr. Arambula testified that a person's personality development—"whether they disregard rules, they're aggressive to others, they steal, those kind of things"—sets the basis for how the person interacts with others in general.

Dr. Dunham testified that Short's history showed a progression of antisocial behavior from an early age. Short began getting into fights when he was ten. While in high school, Short picked fights with younger middle school students. As an adult, Short had multiple intoxication arrests and also had arrests for theft, creating a disturbance, and criminal mischief,

all before his incarceration at age twenty-three.

Dr. Dunham testified that sexual deviancy and having an antisocial orientation are both risk factors for sexual reoffending. He explained that "[s]exual sadism is a type of paraphilia just like pedophilia is a type [of] paraphilia" and is a chronic condition. Dr. Dunham defined "paraphilia" as "recurrent sexual urges, fantasies[,] or behaviors involving children or nonconsenting partners." If a person has paraphilia, "it's persistent, lifelong"; the condition is "very resistant to change" and "usually that stays with them across ... their lifespan." In Dr. Dunham's opinion, sexual deviance affects Short's emotional or volitional capacity.

Dr. Dunham testified, however, that Short's antisocial personality appeared to be decreasing or changing. Further, while some inmates engage in deviant sexual behavior while in prison, Short did not.

However, Dr. Dunham also considered Short's alcohol problem as a factor in his reoffending risk. Dr. Dunham explained that having a substance abuse problem can lower a person's inhibitions "to do things they're already maybe inclined to do." Dr. Arambula agreed with Dr. Dunham that while drugs and alcohol do not cause sexual deviances, they can lower inhibitions. Dr. Dunham testified that Short does not now have "easy access to alcohol," and "if he's outside of that environment he probably would have the problem [with alcohol] again." He pointed out that Short had completed a substance abuse treatment program in prison and still used both drugs and alcohol after completing those programs. Short testified, however, that he had been sober without a relapse for the last six years, and Dr. Dunham conceded that there was no evidence that Short had used drugs or alcohol in the last five or six years. Dr. Dunham concluded, however,

that even without an alcohol problem, Short would still have the sexual deviancy and therefore would have still committed the sexual assaults.

In response, Short called Dr. Mauro, a forensic psychologist and licensed sex offender treatment provider, to testify in his defense. In forming her opinion, Dr. Mauro reviewed the records of Short's evaluation from the behavioral abnormality assessment, *see* Tex. Health & Safety Code Ann. § 841.023, including the sex offender interview of Short; Short's prison disciplinary record; the indictments in his criminal cases; victim statements; Short's medical and mental health records; and copies of depositions of Short, Dr. Dunham, and Dr. Arambula. Based on Dr. Mauro's examination of Short and her review of his records, she diagnosed Short with two conditions: (1) other and specified personality disorder with antisocial and narcissistic features and (2) alcohol use disorder in remission, controlled environment. Dr. Mauro further determined that Short displayed moderate psychopathic characteristics.

Dr. Mauro testified that she did not diagnose Short with sexual deviance because "it's not a diagnosis." She explained that "[c]linically [the term] tends to mean some type of sexual activity with a nonconsenting person or a child, because children cannot consent. Legally it's defined in a couple of different ways within the law.... It's not a diagnosis."

Dr. Mauro also disagreed with Drs. Dunham's and Arambula's diagnoses of sadism. She testified that because rape is not consensual, many victims fight back to some extent, and thus the fact that force is used to commit a rape "is not sufficient to demonstrate that there is an arousal pattern" to the use of force. She explained that people who are sadists usually toy with or torture their victims "for a long time because that process is sexually

arousing to them." In her opinion, Short did not use additional force beyond that needed to gain compliance during the sexual assaults, and he does not have sadism. She acknowledged, however, that the definition of behavioral abnormality does not require the presence of sadism.

As for Short's problem with alcohol, Dr. Mauro considered his alcohol use as a risk factor. However, Dr. Mauro. noted that despite Short's becoming intoxicated several times in prison, he did not sexually act out during his incarceration. To her, this behavior demonstrates that alcohol does not cause Short to commit a sexual act every time he drinks. As a result, Dr. Mauro concluded that Short's personality disorder and alcohol use disorder would not cause him to commit sexually violent offenses to the extent he becomes a menace to the health and safety of another person.

### 2. Short's Empathy Toward Victims and Minimization of Offenses

In Dr. Dunham's opinion, Short showed a lack of empathy or remorse and denied or minimized elements of his offenses, which showed a "lack of taking what he did seriously" and "not understanding the seriousness of his actions." Dr. Dunham concluded that Short was trying to blame his offenses on his alcohol problems and that this evidenced a failure to understand his own risk: "That's his inability to kind of accept really what's going on with him." Dr. Dunham explained that if a person does not believe they are at risk when they are, "they're not going to put the appropriate safeguards in place when they're out there in the community. They're not going to avoid the things that they really need to avoid." Dr. Arambula agreed with Dr. Dunham that Short's minimizing and blaming alcohol was concerning.

In contrast to the State's experts, Short testified that he has empathy for his vic-tims and did not blame alcohol for his actions. He admitted that he was guilty of the offenses for which he was convicted and that the crimes "were very heinous," and he testified that he felt remorse for his offenses. However, he minimized some of his offenses in his testimony. For example, he denied threatening the burglary victim, hitting or shoving the kidnapping victim, or shoving his Home Depot coworker to the ground. Dr. Dunham found this lack of empathy and minimizing of his offenses to be a risk factor for Short's reoffending because it shows him not taking his offenses seriously.

As for his alcohol abuse, Short testified that he did not blame it for his offenses, stating that before his incarceration he "drank every day and . . . didn't rape every day." He further testified, however, that he "kind of doubt[ed] [he] would have done [the offenses] had [he] not been drinking," though he drank "every day, so [he]·can't really tell." Asked on cross-examination if none of the offenses would have happened if he had not been drinking, he responded, "It probably wouldn't have. I would say that but, I mean, I don't know."

Dr. Mauro disagreed with the State's experts on the significance of Short's minimizing his offenses. She testified that research on sexual offending has found that a person's minimizing or denying their sexual offending behavior has no statistical correlation with an increased risk of reoffending.

### 3. The Nature of Short's Offenses

In reaching his conclusions, Dr. Dunham considered the number of Short's victims, the time span in which the offenses occurred, and the circumstances of offenses. Dr. Dunham also considered it significant that Short's offenses occurred close in time, but far enough apart to show a pat-

tern rather than "just one bad day or week." Further, Dr. Dunham testified that Short showed an escalation in his behavior, the victims were strangers, and the offenses were committed while he was on bond after he had already been caught—"that's how out of control he was at the time." Dr. Dunham opined that "one thing you're looking for in any type of risk assessment, especially when there's a cluster-type of offenses, ... is once somebody's caught, what happens next." He stated that the fact that Short committed another sexual offense while out on bond was "extremely significant" because most offenders do not continue to offend after getting caught. Dr. Dunham also considered it relevant that for each of the offenses, Short threatened the victim in some way.

### 4. Short's Disciplinary History, Education, and Treatment in Prison

Dr. Dunham characterized Short's disciplinary history in prison as "not too bad"; it has improved over time, and his disciplinary writeups had significantly decreased over the last five or six years of his incarceration. Short had not been charged with rape or received any disciplinary action because of attempted rape, inappropriate relationships with female correctional officers, or possession of pornography while in prison. Dr. Dunham stated, however, that he did not expect to see any such charges during Short's incarceration because his access to victims was limited, "especially with the type of victims that he's selected in the past." In fact, the lack of new offenses did not affect Dr. Dunham's evaluation of Short because, he explained, Short has a chronic condition.

Dr. Mauro, on the other hand, found it relevant to her evaluation that Short has not had any sexually-related disciplinary writeups despite having "a lot of access to women," more so than normal prisoners do

due to his security level and job. Short testified that he works in the graphics department of his prison and has unsupervised visits with female clients in his own office at the department, and he has never attempted to sexually assault any of them. Nor has he attempted to sexually assault any of the female workers at the prison unit.

Dr. Dunham also acknowledged that Short has participated in substance abuse training and Alcoholics Anonymous. Short has also had one-on-one counseling at various times, attended anger management classes, and participated in a program that includes studying a series of workbooks and books by sex therapists. Dr. Dunham stated that the treatment courses Short has taken are good for him, but they would not reduce his risk because none of the courses are for sex offender treatment. Short had also furthered his education and developed a network outside in the community, and Dr. Dunham concluded that these two factors lowered his risk of reoffending from high to moderate high.

In contrast, Dr. Mauro stated that the work Short has done in furthering his education and participating in treatment programs would be considered a protective factor—something would reduce his risk for sexual recidivism. Likewise, Dr. Arambula considered Short's improving his education level and participation in treatment classes to be positive factors regarding his risk of reoffending.

### 5. Short's Lack of Sex Offender Treatment in Prison

Short testified that he does not need specific sex offender treatment to keep from reoffending because "25 years in prison is not a cake walk," and "[i]t's not something [he] ever want[s] to experience again," "[p]lus it never felt good to hurt somebody."

However, Dr. Dunham testified that sex offender treatment can lower a person's risk of reoffending, but Short has not had such treatment, and that "[y]ou can definitely tell a difference from when somebody is involved in treatment." Similarly, Dr. Arambula testified that in evaluating a person's risk of reoffending, he looks at whether the person has been in sex offender treatment because "the only way to decrease their risk" is when they understand why they committed the offense. "And that's what treatment does, it helps an individual understand their illness." For a person with sexual deviance to not offend, the person has to have the will to not offend, and the person also has to "understand how their illness behaves, what their offense cycle is, what are the things that are triggers, what are their thinking errors, why—what's the reasoning and decision making involved in victim selection."

Likewise, Dr. Mauro acknowledged that Short has not participated in the sex offender treatment program offered by the Texas Department of Corrections. Although Short has participated in a faith-based program that he considered to be sex offender treatment, Dr. Mauro acknowledged that it was not sex offender treatment.

### 6. Short's Post-Prison Environment and Treatment

Short also presented personal witnesses to testify to his post-prison environment and treatment in prison. Short's sister testified that she has a plan to help her brother establish supportive relationships with the community upon his release. William Saunders, a volunteer with a prison ministry, testified about his work with Short through the program. He has known Short for about four years because Short attended weekly Bible study classes taught by Saunders and his wife. He stated that Short is a changed man from when he began the program. Saunders's wife, Lucia Saunders, also testified that Short had changed over the years. In addition, Gary Cobb, another volunteer in a prison ministry, testified. Cobb said that he met Short in 2011, and he has never seen Short exhibit any bad language or misbehavior. Cobb offered that he would be part of a support system for Short upon his release, and Linda Cobb, his wife, testified similarly. The general testimony of these witnesses was evidence that Short would most likely have a stable environment upon his release.

Dr. Mauro considered the fact that Short has family support and is married, as well as the training he has received in prison, to be positive factors that reduce his chance of reoffending. She observed that Short has several pro-social (as opposed to antisocial) positive social relationships, such as with his family, chaplains, and people who do volunteer work in the prison, which she considered important because people who have mostly criminal associations are more likely to reoffend.

### 7. The Experts' Conclusions

All three experts based their conclusions regarding whether Short has a behavioral abnormality on his offenses, his diagnoses, and whether he has other circumstances that make him less likely to reoffend given those diagnoses.

First, Dr. Dunham acknowledged that past behavior is not the only indicator of future behavior, but that present actions and thoughts are also relevant. However, he testified that past behavior is most predictive of future behavior. Based on Short's offenses, his sexual deviance, his antisocial personality, his minimizing of his offenses, and his lack of sexual offender treatment, Dr. Dunham concluded that Short suffers from a behavioral abnormality that makes him likely to engage in a

predatory act of sexual violence. *See In re Commitment of Pilgrim*, No. 09-14-00528-CV, 2015 WL 3897877, at *2–3 (Tex. App.—Beaumont June 25, 2015, no pet.) (mem. op.) (upholding the jury's finding Pilgrim was a SVP based on expert testimony that, among other factors, Pilgrim had sexual deviance, unspecified personality disorder with antisocial features, and polysubstance dependence).

Second, Dr. Arambula testified that the main risk factors for recidivism for a sexual offender is how serious the person's sexual deviance is and how antisocial the person is. Dr. Arambula stated that Short's "heaviest" factor is the offenses he committed—the number of women that he raped or tried to rape, the force he used, the number of offenses within the short time period, and the fact that he offended after having been caught. *See id.*; *see also Wirtz*, 451 S.W.3d at 466 (considering the fact that Wirtz violated his probation twice, once by exposing himself to a child and once by exposing himself to an elderly woman, as evidence supporting the jury's finding that Wirtz is a sexually violent predator). He also saw Short's personality disorder as a negative factor. Like Dr. Dunham, Dr. Arambula concluded that based upon his training and experience, Short suffered from a behavioral abnormality that made him likely to engage in a predatory act of sexual violence.

Finally, unlike the State's experts, Dr. Mauro concluded that Short does not have a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Dr. Mauro testified that while past behavior is important, current behavior and current functioning are also indicators of future behavior, and she found Short's prison disciplinary history, his sobriety, his education, and community support system showed a reduced risk of reoffending. The primary reason for her conclusion that Short does not have a behavioral abnormality was that in her opinion, Short does not have a qualifying condition.

**8. The Evidence Supports the Jury's Verdict**

After considering the evidence presented to the jury in the light most favorable to the verdict, we hold that a rational trier of fact could find that Short has a congenital or acquired condition that, by affecting his emotional or volitional capacity, predisposes him to commit a sexually violent offense, to the extent that he becomes a menace to the health and safety of another person—in other words, that he has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See* Tex. Health & Safety Code Ann. § 841.002. Accordingly, we overrule Short's first issue. *See Stuteville*, 463 S.W.3d at 551.

We further hold that, based on all the evidence, the verdict does not reflect that a risk of an injustice remains too great to allow the verdict to stand. Because the evidence is therefore factually sufficient to support the jury's finding that Short has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence, we overrule Short's second issue. *See id.*

**III. Conclusion**

Having overruled Short's two issues, we affirm the trial court's judgment ordering Short's civil commitment.