

**NUMBER 13-19-00158-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN RE THE COMMITMENT OF RANDALL MARK DRIGGERS

On appeal from the 144th District Court
of Bexar County, Texas.

# MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Perkes**
**Memorandum Opinion by Justice Longoria**

After a jury found appellant Randall Mark Driggers to be a sexually violent predator (SVP), the trial court civilly committed Driggers for sex-offender treatment and supervision. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.001. By three issues, Driggers argues that the evidence was legally and factually insufficient to support the trial court's finding that he is a sexually violent predator (issues one and two, respectively), and that the trial court erred by refusing to include a jury instruction on the possibility of a non-unanimous verdict in his favor (issue three). We affirm.

# I.     BACKGROUND[1]

In 2018, Driggers was incarcerated in the Texas Department of Criminal Justice—Institutional Division (TDCJID) when the State filed its petition requesting Driggers be civilly committed for treatment and supervision because of his alleged status as a sexually violent predator.  At the time, Driggers was pending entry into the TDCJID sex offender treatment program.

On November 27, 2018, trial on Driggers's civil commitment began.  The State's sole witness was Jason Dunham, a forensic psychologist.  He was retained by the State to evaluate Driggers and opine as to whether Driggers displayed a behavioral abnormality that warranted civil commitment. *See id.*  According to Dunham, he begins his evaluation process by reviewing the records and documents pertaining to the individual in question.  He then personally interviews the person, performs some psychological testing, identifies both risk factors and protective factors regarding the individual's likelihood in committing future predatory sexual offenses, and then comes to a final opinion.

According to the records and criminal history that Dunham reviewed, in 1980, Driggers was arrested for voluntary manslaughter in Georgia when he was about eighteen years old.  At the time, Driggers was dating a girl one or two years younger than him but her mother forbade the relationship.  The mother was found dead, strangled, beaten, and scratched, face down in an empty bath tub.  Driggers was not originally suspected, but his girlfriend began to "put the pieces together" and started becoming suspicious of Driggers.  According to the girlfriend, several months after her mom was found dead, Driggers picked his girlfriend up from school and forced her to have sex with him; she

---

[1] This case is before this Court on transfer from the Fourth Court of Appeals in San Antonio pursuant to a docket-equalization order issued by the Supreme Court of Texas.  *See* TEX. GOV'T CODE ANN. § 73.001.

claimed that Driggers had a gun and threatened to kill both her and himself. Later, Driggers was arrested when he was attempting to take her across the state line to South Carolina. His girlfriend had been leaving "please help me" notes written on toilet paper in gas station bathrooms; she even told one attendant that she needed help. Driggers was not convicted of any sexual crimes against the girlfriend, but he was sentenced to fifteen years in prison for voluntary manslaughter.

When Dunham asked Driggers about this conviction during a personal interview, Driggers claimed he approached the mother hoping to discuss his relationship with her daughter. However, according to Driggers, she had a metal splint on her finger, which he allegedly mistook for a knife. As a result, he reflexively punched her in the throat and killed her. Dunham testified that Driggers's statements are completely inconsistent with what the record reflected: a strong suggestion of a "struggle and that she was—she died by strangulation." Even though the adjudicated offense was a nonsexual crime, Dunham testified that it was relevant to finding Driggers to be a sexual predator because this shows the "beginning of the pattern of behavior for him." According to Dunham, Driggers admitted to killing the mother but "[w]hat he doesn't admit to is more what I believe is the planning behavior and the struggle it involves. So, it wasn't just an impulsive throat punch, which is what he was leading me to believe."

Dunham testified that while Driggers was in prison, he was convicted of attempting to escape from prison. Driggers was later released on parole, but his parole was revoked for breaking curfew. Driggers was fully discharged in 1989.

Dunham then testified regarding two sexual assaults Driggers committed a few years after being released. The first offense occurred in June 1991 when Driggers was

3

about twenty-nine years old.  Driggers and his new wife moved to Texas because she had family in Texas.  While his wife was out of town, Driggers convinced Kari, a friend of his wife, to come to the house he was staying in to pick up a gift he had for Kari's boyfriend.  According to Kari, when she arrived, Driggers asked her to close her eyes.  She refused to close her eyes, but when she entered the home, Driggers bear hugged her and dragged her to the floor, telling her, "I've always wanted you and I wondered what you looked like with your shirt off."  He then forced her clothes off, removed his own clothing, and straddled her naked, threatening to beat her unconscious if she would not perform oral sex on him.  He also threatened to kill her if she would not stop crying.  Kari claimed that he also brandished a knife and forcefully had vaginal intercourse with her.  Driggers told Kari to call work and tell them she had a flat tire that day and additionally instructed Kari not to say anything to anyone about what happened because "I will be behind you with a knife."

Dunham asked Driggers about this incident in the personal interview.  According to Driggers, Kari had been flirting with him and they had consensual sex.  She changed her mind while they were having sex, so he ejaculated onto her.

Dunham testified that Driggers was arrested for sexually assaulting Kari and that Driggers's father-in-law posted bond.  Just one month after sexually assaulting Kari, and while still on bond, Driggers sexually assaulted his mother-in-law.  According to the record Dunham reviewed, Driggers visited her at about 10:00 in the morning while she was alone and forced her "to masturbate him and give him oral sex at gunpoint."  The mother-in-law claimed that he pulled the trigger to shoot her but "the shot didn't fire[,] and he started laughing."  He then apologized and took the bullets out of the gun.

4

When Dunham asked Driggers about this incident, Driggers admitted to the forced sex but denied using a gun or making any threats; he asserted he was merely returning a gun he had borrowed from his father-in-law. Driggers also told various people that he and his mother-in-law were having an extended affair at the time.

Concerning these two offenses, Driggers pleaded guilty to aggravated sexual assault and sexual assault. *See* Tex. Penal Code Ann. §§ 22.011, 22.021. He was sentenced to forty years in prison, each to run concurrently.

Dunham testified concerning several risk factors he observed while reviewing Driggers's convictions. Concerning the manslaughter conviction, the following conversation occurred:

[State]: So—and specifically referencing that voluntary manslaughter, what risk factors, if anything, did you pull from that from Mr. Driggers?

[Dunham]: It was—it was a violent act. It was—I believe that it was planned. I believe that it had to do—I believe it was completely callous. I believe it had to do with [the mother] not wanting them to have a relationship and a planned—planned attack on her.

Another risk factor is that he is 18 years old, so at a young age at the first violent offense. And then sort of what happens afterwards is—is—is part of this, that he stayed with his girlfriend even after killing her mother and not letting anybody know and then continued to date. That—to me, that's—that's callous behavior. It's psychopathic behavior.

[State]: Why would that be callous or psychopathic behavior?

[Dunham]: It's almost—to me, it's—it's as if nothing happened. I believe they even went to like church that night after he did that to— to her mom and she had no idea, you know, what was going on. So, I mean, I think it takes a person—a pretty psychopathic person to be able to do something like that.

5

Concerning the sexual assault against Kari, Dunham noted several risk factors: (1) the amount of planning involved; (2) manipulation; (3) committing a sex offense while married; (4) committing a sex offense within two years after being released from prison; (5) using a knife, indicating a continuing pattern of violent behavior; (6) committing the offense against a victim unrelated to himself because "people who offend outside the family are generally considered higher risk than those who stay within the family"; (7) the callousness on display; and (8) continued victim blaming. Concerning the risk factor of victim blaming, Dunham explained:

> Victim blaming is a dynamic risk factor that have [sic] to do with when somebody rationalizes their sexual offending. So, instead of taking full blame for one's behavior, you know, it's my fault, totally my fault, the person is actually putting the blame on somebody else. Well, in this case he's saying, well, she came on to me, she instigated it, she was flirting with me. She said no at the last minute. So, in essence, he's blaming her for leading him on that way.
>
> . . .
>
> That's important because if he doesn't believe that he did anything wrong and that's how he believes about his other offenses as well, then he's not going to, you know, put any protections in place out there when he goes out. And he is really not—he doesn't have the tools to—to avoid being in a similar situation and acting similarly again.

When asked to identify risk factors concerning the aggravated sexual assault against Driggers's mother-in-law, Dunham testified as follows:

> This is now a related victim, so he has had unrelated and related. This is—I think he's very indiscriminate in his victim selection. He's offended against his mother-in-law . . . . This is the second mother-in-law or mother of a partner that he has been violent to. She is twice the age of his victim he had one month before so I don't think he's real discriminate.
>
> I think the escalation of violence, I think the psychopathic nature was extreme in this one. And the way the victim was describing it, it was pretty terrifying. She really felt like he was going to kill her. And he laughed when the gun didn't go off. So, to me, I don't—I don't think—I don't know, when

6

> you take all of his cases together now and you see—see them as a whole, I'm not sure it gets much more sadistic and violent then he has been.

Dunham noted additional risk factors, such as: (1) committing a sexual offense so shortly after, and while still on bond for, a previous sexual assault; and (2) continued evidence of victim blaming.

Dunham also testified concerning a few protective factors, which are factors which mitigate or reduce the risk of Driggers committing further sexual offenses. Dunham noted that Driggers is currently fifty-six years old. According to Dunham, this is Driggers's largest protective factor because recidivism rates for sexual offenders decreases with age. Driggers also attended a four-month sexual offender education course. However, Dunham considered this a very small protective factor because Driggers could not recall any of the information or even concepts taught in the program.

Dunham explained that psychopathy is an extreme degree of antisocial personality disorder and that psychopaths lack moral reasoning. Dunham testified that he employed the Psychopathy Checklist-Revised (PCL-R) to gauge Driggers's level of psychopathy. Driggers scored a 25.3 on the PCL-R, indicating a high level of psychopathy.

Dunham also scored Driggers on the Static-99R; Dunham testified that the Static-99R is an actuarial instrument to estimate the risk of being convicted for a sexual offense in the future. Driggers scored a three on this test meaning he was within the "average risk category" of sexual offenders for being reconvicted in the future for a sexual offense. However, Dunham added that the Static-99R is a starting place, and then you look at the big picture, including other factors. When asked about whether a score of three correlates to a specific percentage of risk of reconviction, Dunham gave the following response:

7

I don't use the numbers and the percentages in these type of cases when I know that I'm testifying in a trial such as this because it's not about numbers, it's about likelihood, and I think it can be misleading. And I think that, for example, one number to somebody might mean a different number to somebody else and which could mean—which could affect the word "likely." For example, if I told you—you know, I use sports examples a lot. If I told you that somebody was a 60 percent free throw shooter, if you don't know anything about basketball you might think 60 percent, not bad. This guy is likely to make the free throw right here. Okay. Actually, 60 percent is terrible. All right. So, another person might see 60 percent, this person is not likely to make a free throw right here.

Same with baseball. Somebody has a 340 batting average, 34 percent chance that they're going to get a hit, not likely. But for somebody else that's likely because that might lead the league in hitting.

Dunham also used the Diagnostic and Statistical Manual of Mental Disorder (DSM-5) to diagnose Driggers. Using the DSM-5, Dunham diagnosed Driggers with unspecified nonconsent paraphilic disorder, meaning Driggers has had a life-long, abnormal sexual behavior—being aroused to nonconsensual sex—that is resistant to change. Dunham also gave Driggers a ruled-out diagnosis of sexual sadism—sexual arousal to the pain, humiliation, or suffering of another person. A rule-out diagnosis is not an official diagnosis but rather serves as a red flag for a possible diagnosis. In other words, Dunham opined that he needed more evidence to fully diagnose Driggers with sexual sadism, but there were several indicators that suggested Driggers might possess sexual sadism.

Driggers admitted that he had "been on some dope" during the second sexual assault. He also acknowledged that he had consumed LSD and cocaine the morning of the assault. Even though he claims he does not currently have a substance abuse problem, Dunham admitted to using cocaine, methamphetamines, LSD, marijuana, and alcohol heavily before he was incarcerated. Dunham diagnosed Driggers with polysubstance abuse using the DSM-5. Dunham testified that many illegal drugs

8

disinhibit people, lowering their moral values. According to Dunham, this is a high-risk factor with people possessing sexual deviance, such as Driggers.

Based on all of the all of the above, Dunham opined that Driggers suffers from a behavioral abnormality that makes him likely to commit a predatory act of sexual violence. And because Driggers is an "untreated sex offender who is psychopathic who doesn't have the tools to avoid reoffending," Dunham opined that Driggers is a menace to the health and safety of others.

The jury unanimously found that Driggers is a sexually violent predator. The trial court civilly committed Driggers for sex-offender treatment and supervision. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.003. Driggers filed a motion for new trial, which was overruled as an operation of law. This appeal followed.

## II. LEGAL AND FACTUAL SUFFICIENCY

In his first and second issues, Driggers argues that there was factually and legally insufficient evidence to support a finding beyond a reasonable doubt that he is a sexually violent predator.

### A. Standard of Review and Applicable Law

We review sexually violent predator civil commitment proceedings for legal sufficiency of the evidence using the appellate standard of review applied in criminal cases. *In re Commitment of Short*, 521 S.W.3d 908, 911 (Tex. App.—Fort Worth 2017, no pet.). We assess the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find the statutory elements required for commitment beyond a reasonable doubt. *Id.*

9

"When reviewing the factual sufficiency of the evidence to support a civil commitment order, we weigh all the evidence to determine whether a verdict that is supported by legally sufficient evidence nevertheless reflects a risk of injustice that would compel ordering a new trial." *Id.* We reverse only if, after weighing the evidence, we determine that the risk of an injustice remains too great to allow the verdict to stand. *Id.*

Chapter 841 of the Texas Health and Safety Code (the SVP Act) provides a procedure for the involuntary civil commitment of a sexually violent predator. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–.153; *see also In re Commitment of Hull*, No. 13-17-00378-CV, 2019 WL 3241883, at *1 (Tex. App.—Corpus Christi–Edinburg July 18, 2019, pet. filed) (mem. op.) (detailing the background and purpose of sexually violent predator statutes in Texas). A person can only be civilly committed if the factfinder determines, by a unanimous verdict and beyond a reasonable doubt, that the person is an SVP. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.062, 841.081. An SVP is a person that (1) is a repeat sexually violent offender, and (2) suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *Id.* § 841.003(a). A person is a repeat sexually violent offender if the person is convicted of more than one sexually violent offense and a sentence is imposed on at least one of those convictions. *Id.* § 841.003(b). A behavioral abnormality is defined as "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2).

**B. Analysis**

As to the first prong, Driggers does not dispute that the evidence demonstrates that he is a repeat sexually violent offender. *See id.* § 841.003(b). As to the second prong, Driggers argues that the evidence was legally and factually insufficient to support a finding that he suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *Id.* § 841.003(a).

### 1. Legal Sufficiency

Driggers complains that Dunham's opinions should have been excluded because they were not based on data and they were "too dependent upon [Dunham's] subjective guesswork." *In re Bohannan*, 388 S.W.3d 296, 305–306 (Tex. 2012). More specifically, Driggers complains that Dunham did not present to the jury the specific recidivism risk rates related to scoring a three on the Static-99R. Accordingly, without Dunham's testimony, Driggers argues there was insufficient evidence. The State contends that it did not need to prove any specific percentages for the risk of reoffending. We agree with the State.

Several of our sister courts have addressed similar arguments and they have ultimately concluded that the SVP Act does not require the State to present a specific percentage of risk concerning whether an offender is likely to reoffend. *See In re Commitment of Kalati*, 370 S.W.3d 435, 439 (Tex. App.—Beaumont 2012, pet. denied) ("Chapter 841, which employs the term 'likely,' does not define it and does not require a numerical or percentage statement of whether a person is 'likely' to reoffend."); *see also In re Commitment of Riojas*, No. 04-17-00082-CV, 2017 WL 4938818, at *4 (Tex. App.—San Antonio Nov. 1, 2017, no pet.) (mem. op.); *In re Commitment of Manuel*, No. 01-18-00650-CV, 2019 WL 2458986, at *5 (Tex. App.—Houston [1st Dist.] June 13, 2019, no

pet. h.) (mem op.) ("[T]here is no numeric value or label that can be used to determine whether an offender is 'likely' to reoffend."); *In re Commitment of Brown*, No. 05-16-01178-CV, 2018 WL 947904, at *9 (Tex. App.—Dallas Feb. 20, 2018, no pet.) (mem. op.) ("[U]se of the term 'likely' in the Act does not require evidence of a specific percentage of risk, and the term should not be interpreted to mean 'more likely than not.'"); *In re Commitment of Terry*, No. 09–15–00500–CV, 2016 WL 7323299, at *13 (Tex. App.—Beaumont Dec. 15, 2016, no pet.) (mem. op.) ("[T]his Court has rejected the notion that the term 'likely' has a precise definition of the type associated with any certain assigned percentage of risk."). Thus, regarding the second prong, the State did not need to present specific numeric values associated with the risk of Driggers reoffending; rather, the State merely needed to show that Driggers suffers from a behavioral abnormality that makes him "likely to engage" in a predatory act of sexual violence. TEX. HEALTH & SAFETY CODE ANN. § 841.003(a).

Dunham testified regarding all of the resources he consulted in forming his opinions, including criminal records, court records, parole records, prison records, depositions, his use of actuarial tests, and his interview with Driggers. Dunham then discussed the various risk factors he considered and how they affected his overall conclusion regarding Driggers's likelihood to commit a predatory act of sexual violence. Assessing the evidence in the light most favorable to the verdict, we conclude there was more than a scintilla of evidence to support the jury's finding. *See In re Commitment of Short*, 521 S.W.3d at 911. We overrule Driggers's first issue.

### 2. Factual Sufficiency

12

In our factual sufficiency analysis, we weigh all of the evidence in a neutral light to determine whether the jury's finding is so against the great weight and preponderance as to be manifestly unjust. *See id.*

While discussing and reviewing Driggers's criminal history, Dunham identified several risk factors regarding Driggers's likelihood in committing predatory sexual offenses, which we highlighted in more detail above. Concerning Driggers's conviction for voluntary manslaughter, Dunham testified that it marked the "beginning of the pattern of behavior for him." According to Dunham, the record in that case reflected that Driggers did not "reflexively" punch the victim, but rather the offense involved a lot more planning than he led others to believe. Also, Dunham stated the offense demonstrated Driggers's extreme psychopathy and callousness because he acted as if nothing was wrong in the aftermath of the offense, and he committed this offense while only eighteen years old.

As discussed above, Dunham also testified concerning two sexual offenses Driggers committed after being released from prison. Dunham identified multiple risk factors concerning the first sexual assault committed against a non-relative. A few of the factors were callousness, victim blaming, and committing this sex offense within two years of being released from prison. Dunham asserted that the victim blaming was particularly relevant because if "[Driggers] doesn't believe he did anything wrong and that's how he believes about his other offenses as well, then he will not do anything to protect himself from repeating the criminal behavior."

Regarding the sexual offense committed against his mother-in-law, Dunham testified that it was concerning, especially viewed in connection with the first sexual offense. The first offense involved a victim who was relatively young and not related to

himself; the victim of the second offense was his mother-in-law and twice the age of the victim in his first sexual offense. This demonstrates that Driggers is not very "discriminate" in choosing targets for his offenses.

According to Dunham, two of the biggest risk factors in determining the likelihood of committing a predatory act of sexual violence are sexual deviance and antisocial orientation. Dunham defined sexual deviance as "abnormal sexual behavior that, you know, causes problems usually within somebody else." Dunham explained that antisocial orientation refers to "somebody who has a criminal mindset and displays criminal behaviors." Dunham opined that the combination of these two factors is particularly dangerous and that Driggers possesses both of these traits. Dunham further testified that Driggers uses violence to threaten and humiliate his victims because he is "aroused [by] nonconsensual sex" and he is "turned on by the violence and by the fear in his victims."

Dunham also testified concerning a few protective factors, such as Dunham's age. According to Dunham, this is Driggers's largest protective factor because recidivism rates for sexual offenders generally decrease with age. Driggers also attended a four-month sex offender education course. However, Dunham considered this a very small protective factor because according to Dunham, Driggers does not appear to have learned anything from the course.

Driggers scored a 25.3 on the PCL-R, indicating a high level of psychopathy. On the Static-99R, Driggers was within the "average risk category" of sexual offenders for being reconvicted in the future for sexual offense. Using the DSM-5, Dunham diagnosed Driggers with unspecified nonconsent paraphilic disorder, meaning Driggers has had a life-long, abnormal sexual behavior—being aroused to nonconsensual sex—that is

14

resistant to change. Dunham also gave Driggers a ruled-out diagnosis of sexual sadism. Dunham also diagnosed Driggers with polysubstance abuse, which is a "high-risk" factor, especially for people like Driggers who possess sexual deviance.

The only evidence to contradict Dunham came from Driggers's own testimony. Driggers denied being "a rapist," denied having any sexual deviance, stated he never "had a problem with sex," and declared that there was zero risk of him ever reoffending. However, as discussed above, Dunham argued that such a level of denial was itself a risk because if Driggers will not admit that he did anything wrong, he will not protect himself from repeating criminal behaviors again in the future. Driggers testified that he was high during both of his sexual offenses and that he would not have committed any sexual offenses if he had not been under the influence of drugs. According to Driggers he is currently cured of his drug addiction. Dunham opined that Driggers has only been sober the last several decades because he has been isolated from addictive substances while in prison; however, Dunham opined that there is a risk that Driggers will start using drugs again, especially because Driggers admitted that he did not take any of the substance abuse classes offered in prison. Lastly, Driggers admitted that most of what he learned in his sex offender rehabilitation course is a "blur."

After considering the evidence presented to the jury in the light most favorable to the verdict, we hold that a rational trier of fact could find that Driggers has a congenital or acquired condition that, by affecting his emotional or volitional capacity, predisposes him to commit a sexually violent offense, to the extent that he becomes a menace to the health and safety of another person—in other words, that he has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See* TEX. HEALTH &

15

SAFETY CODE ANN. § 841.002; *In re Commitment of Short*, 521 S.W.3d at 911. Accordingly, we overrule Driggers's second issue.

### III. UNANIMOUS JURY VERDICT

In his third issue, Driggers argues that the trial court abused its discretion by refusing his requested jury charge instruction that the jury could render a "no" verdict in his favor nonunanimously with a 10-2 vote.

### A. Standard of Review and Applicable Law

Whether a jury may return a nonunanimous "no" verdict in a civil commitment case is an issue of statutory construction, a matter of law that we review de novo. *In re Commitment of Jones*, 571 S.W.3d 880, 889 (Tex. App.—Fort Worth 2019, pet. filed).

To obtain a reversal of a judgment on the basis of trial-court error in civil cases, the appellant must show that an error occurred and that said error probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case on appeal. TEX. R. APP. P. 44.1(a). "To determine whether the instruction probably caused an improper judgment, we examine the entire record. An improper instruction is especially likely to cause an unfair trial when the trial is contested and the evidence sharply conflicting." *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001) (internal citation omitted).

Under the SVP Act, "[a] jury determination that the person is a sexually violent predator must be by *unanimous verdict.*" TEX. HEALTH & SAFETY CODE ANN. § 841.062 (emphasis added).

### B. Analysis

16

Assuming without deciding that the trial court erred in rejecting Driggers's requested jury charge instruction, we conclude that any such error was harmless.

Driggers requested the trial court to inform the jury that it could return a "no" verdict in this case nonunanimously with a 10-2 vote. Driggers cites *Jones*, 571 S.W.3d at 889 to support his proposition. In *Jones*, the appellant argued the trial court erred by failing to instruct the jury on the possibility of a nonunanimous 10-2 verdict in his civil commitment case. *Id.* The appellate court agreed and concluded that it was harmful error because "[a]lthough we do not know precisely how the vote among the jurors was split during deliberations, we know that a split existed." *Id.* at 891. The court further observed that the jury submitted four notes to the trial court over four hours after jury deliberation began, including one note declaring that the jury was deadlocked. About an hour and a half after the trial court gave the jury a modified *Allen* charge, the jury returned a unanimous "yes" verdict. *See id.* The appellate court held, "[b]ecause we know that a split existed, a 10-2 instruction could have had a significant impact on this situation." *Id.*

By contrast, in the present case, there is no evidence that the jury's vote was ever split, and the evidence against Driggers was not "sharply conflicting," but rather quite substantial. *Quantum Chem. Corp.*, 47 S.W.3d at 480; *see Jones*, 571 S.W.3d at 889. Under the facts of this case, we cannot say that the trial court's failure to include a 10-2 jury charge instruction probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a); *see In re Commitment of Hatcher*, No. 09-15-00068-CV, 2015 WL 6745399, at *6 (Tex. App.—Beaumont Nov. 5, 2015, no pet.) (mem. op.) ("[T]he record does not indicate that, had the instruction included the language requested by [appellant]

17

or otherwise been changed to more closely track the language of section 841.062(b), the verdict would have been different.").  We overrule Driggers's third issue.

## IV. Conclusion

We affirm the trial court's judgment.


                                                    NORA L. LONGORIA
                                                    Justice

Delivered and filed the
12th day of December, 2019.

18