

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00364-CV

_____

IN RE: THE COMMITMENT OF JEFFERY LEE STODDARD

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court No. D371-S-13391-16

Before Sudderth, C.J.; Walker and Birdwell, JJ.
Opinion by Chief Justice Sudderth
Walker, J., filed a concurring and dissenting opinion.

**MEMORANDUM OPINION**

Appellant Jeffery Lee Stoddard appeals the trial court's order that he be civilly committed as a sexually violent predator. *See* Tex. Health & Safety Code Ann. § 841.003 (West 2017). Because the evidence is factually insufficient to support the jury's finding that Stoddard is a sexually violent predator, we reverse.

**Background**

In 2003, Stoddard was charged with aggravated sexual assault of two children, seven-year-old Alice and her six-year-old brother Bobby,[1] indecency with a child by contact by touching Bobby's genitals, and possession of child pornography. *See* Tex. Penal Code Ann. §§ 21.11, 22.021(a)(1)(B) (West Supp. 2017), § 43.26 (West 2016). Stoddard was accused of forcing the two children to perform oral sex on each other, of performing oral sex on Alice and receiving oral sex from her ten or eleven times, of withholding food from Alice unless she engaged in oral sex, of attempting anal sex with Alice, of touching Alice's genitals, and of causing Alice to touch his genitals, all while he was living with the children and their mother, Linda. In May 2004, Stoddard pleaded guilty to the charges of aggravated sexual assault and possession of child pornography. The jury assessed two twenty-year sentences for the aggravated sexual

---

[1]We use aliases to refer to the children in order to protect their privacy. *See* Tex. R. App. P. 9.9(a), 9.10(a) (providing privacy protection for sensitive data in civil and criminal cases, including the name of a minor).

assault convictions and a ten-year sentence for the child pornography conviction, and he served them concurrently.

After Stoddard served twelve years in prison, he became eligible for parole and was scheduled to be released on or before September 2017. Before his scheduled release date, in November 2016, the State filed a petition to have Stoddard civilly committed as a sexually violent predator. *See* Tex. Health & Safety Code Ann. § 841.041(a) (West 2017). After a trial, the jury found that Stoddard was a sexually violent predator, and the trial court ordered that he be civilly committed.

Stoddard argues that the jury's finding is not supported by factually sufficient evidence, and we agree. To assist with our analysis, we will begin with a discussion of the history of civil commitments of sexually violent predators before moving on to the facts of this case.

## I. A history of civil commitments of sexually violent predators

### A. Nationwide

A proper evaluation of this case requires an understanding of the background and development of civil commitment proceedings for sexually violent predators in the United States. These proceedings are not new developments in the law—they have been around in some fashion since at least the 1930s. *See* Christy Jack & Jessica Marsh, *Civil Commitment: Coming to a Town Near You*, State Bar of Tex. Prof. Dev. Program, Advanced Criminal Law Course (2017) (citing Roxanna Lieb, Vernon Quinsey & Lucy Berliner, *Sexual Predators and Social Policy*, 23 Crime & Just. 43, 55

(1998) (hereinafter Lieb, 23 Crime & Just.)). But early versions of so-called "sexual psychopath" laws cast a broad net and were often criticized for failing to distinguish the more violent sex offenders from the less serious ones (i.e., peeping Toms). *See* Lieb, 23 Crime & Just. at 63–65. After reaching a peak across the nation in the mid-1960s, these laws eventually fell into disfavor primarily because of perceived abuses, and many of them were repealed by the mid-1980s. *See* Tamara Rice Lave & Franklin E. Zimring, *Assessing the Real Risk of Sexually Violent Predators: Doctor Padilla's Dangerous Data*, 55 Am. Crim. L. Rev. 705, 711–12 (2018) (discussing reports of prosecutors' use of sexual psychopath proceedings "in otherwise weak cases to lock away nuisance offenders for indefinite periods of time" and in conditions of "bare custodial confinement" with no attempt at clinical treatment); Lieb, 23 Crime & Just. at 65.

A new generation of civil commitment laws targeting sex offenders began in 1990 with Washington's passage of the first "sexually violent predator" civil commitment laws, laws that were inspired by the case of Earl Kenneth Shriner. Lieb, 23 Crime & Just. at 66; *see also* Wikipedia: *Earl Kenneth Shriner*, https://en.wikipedia.org/wiki/Earl_Kenneth_Shriner (last visited Sept. 20, 2018). Shriner was a mentally retarded sex offender with a 24-year history of killing, sexual assault, and kidnapping. Lieb, 23 Crime & Just. at 66. Washington prison officials attempted to have him civilly committed after his service of ten years in prison and their discovery of his plans to torture children after his release. *Id.* These attempts proved unsuccessful, and two years after his release Shriner kidnapped a seven-year-

old boy, raped, strangled, and sexually mutilated him, and then left him in the woods to die. *Id.*

In response to the public outcry over the heinous crime, a task force was appointed and proposed a solution that was subsequently enacted into law. The laws passed were intended to address a group of "small but exceedingly dangerous . . . sexually violent predators" that were not amenable to already available means for involuntary commitment. Wash. Rev. Code. Ann. § 71.09.010 (amended 2001). Washington's statutory scheme provided a means to civilly commit sex offenders with at least one prior crime of sexual violence and upon a showing that they suffered from a "mental abnormality or personality disorder" that made them likely to engage in future predatory acts of sexual violence. *Id.* § 71.09.020 (amended 2015).

Washington's approach became a model for other states, and in 1997 the United States Supreme Court gave these laws its blessing in *Kansas v. Hendricks*, 521 U.S. 346, 117 S. Ct. 2072 (1997). Kansas's Sexually Violent Predator Act was enacted in 1994, and the first person to be committed under it was Leroy Hendricks. *Id.* at 350, 117 S. Ct. at 2076. Hendricks had a long history of sexually molesting children. *Id.* He was convicted in 1984 of taking "indecent liberties" with two 13-year-old boys and was sentenced to ten years' confinement. *Id.* at 353, 117 S. Ct. at 2078. The Supreme Court described Hendricks's long history of predatory conduct based upon his own testimony at the civil commitment hearing as a

chilling history of repeated child sexual molestation and abuse, beginning in 1955 when he exposed his genitals to two young girls. At that time, he pleaded guilty to indecent exposure. Then, in 1957, he was convicted of lewdness involving a young girl and received a brief jail sentence. In 1960, he molested two young boys while he worked for a carnival. After serving two years in prison for that offense, he was paroled, only to be rearrested for molesting a 7-year-old girl. Attempts were made to treat him for his sexual deviance, and in 1965 he was considered "safe to be at large," and was discharged from a state psychiatric hospital. . . .

Shortly thereafter, however, Hendricks sexually assaulted another young boy and girl—he performed oral sex on the 8-year-old girl and fondled the 11-year-old boy. He was again imprisoned in 1967, but refused to participate in a sex offender treatment program, and thus remained incarcerated until his parole in 1972. Diagnosed as a pedophile, Hendricks entered into, but then abandoned, a treatment program. . . . [S]oon after his 1972 parole, Hendricks began to abuse his own stepdaughter and stepson. He forced the children to engage in sexual activity with him over a period of approximately four years. Then, as noted above, Hendricks was convicted of "taking indecent liberties" with two adolescent boys after he attempted to fondle them.

*Id.* at 354–55, 117 S. Ct. at 2078. At trial Hendricks admitted that he could not control his urges to molest children, despite his claimed recognition of the harm caused by his behavior and stated "that the only sure way he could keep from sexually abusing children in the future was 'to die.'" *Id.* at 355, 117 S. Ct. at 2078. Hendricks agreed with the state physician's diagnosis that he suffered from pedophilia and told the physician that "treatment is bull****." *Id.* at 355, 117 S. Ct. at 2079.

The Supreme Court rejected Hendricks's claims that Kansas's Sexually Violent Predator Act violated the requirements of substantive due process and the prohibitions of double jeopardy and ex post facto lawmaking. *Id.* at 356–71, 117 S. Ct. at 2079–2086. But in so doing, the court noted that simply being dangerous is

6

not sufficient cause for indefinite involuntary commitment. *Id.* at 358, 117 S. Ct. at 2080.

## B. In Texas

Legislative efforts to establish sexually violent predator civil commitment proceedings in Texas began in 1995 with a bill to establish court-ordered mental health services for those offenders deemed to be sexually violent predators. Tex. H.B. 595, 74th Leg., R.S. (1995). That effort and a second in 1997 were unsuccessful. *See id.*; Tex. S.B. 77, 75th Leg., R.S. (1997).

Finally, with the enactment of Chapter 841 of the health and safety code in 1999, the Texas Legislature recognized the existence of "a small but extremely dangerous group of sexually violent predators" with behavioral abnormalities that are not amenable to traditional mental illness treatment modalities and that make them likely to engage in repeated predatory acts of sexual violence. Act of May 19, 1999, 76th Leg., R.S., ch. 1188, § 4.01, 1999 Tex. Gen. Laws 4143, 4143 (codified at Tex. Health & Safety Code Ann. § 841.001 (West 2017)).

After 15 years of "[h]orrible mismanagement," the system for civilly committing sexually violent predators was overhauled in 2015. *See* Sen. Comm. on Criminal Justice, Bill Analysis, Tex. S.B. 746, 84th Leg., R.S. (2015). At that time, there were over 25,000 sex offenders in prison and there were 380 civilly committed sexually violent predators—less than 2% of imprisoned sex offenders. *Id.* As of

March 2017, there were 423 civilly committed sexually violent predators in Texas. *See* Jack, *Civil Commitment: Coming to a Town Near You* at 16.

### 1. The civil commitment process

Pursuant to chapter 841, within two years of the anticipated release date of any person serving a sentence for a sexually violent offense, the Texas Department of Criminal Justice (TDCJ) is required to notify a multidisciplinary team of the anticipated release. Tex. Health & Safety Code Ann. § 841.021 (West 2017). The team, composed of individuals from various state agencies, including a mental health professional, a licensed sex offender treatment provider, and a licensed peace officer, then conducts a two-part assessment of the inmate. *Id.* § 841.022 (West 2017).

First, the team assesses whether the person is a repeat sexually violent offender and whether they believe he is likely to commit a sexually violent offense after release. *Id.* § 841.022(c). The team then notifies TDCJ of its assessment and, if appropriate, recommends the assessment of the person for a behavioral abnormality. *Id.* § 841.022(c)(2)–(3). If the team recommends a behavioral abnormality assessment, the second part of the assessment takes place.

At that point, TDCJ must consult an expert to ascertain if the person suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *Id.* § 841.023(a) (West 2017). Based upon the expert's opinion, if TDCJ determines that he does suffer from a behavioral abnormality, TDCJ must give

notice to the attorney representing the state for the county in which the person was most recently convicted of a sexually violent offense. *Id.* § 841.023(b).

After receiving TDCJ's notice, the state's attorney has 90 days to file a petition for civil commitment. *Id.* § 841.041(b)(1). Once the petition is filed, the trial court is required to conduct a trial within 270 days. *Id.* § 841.061(a) (West 2017). The statute expressly grants the person certain rights during the proceeding, including the right to appear at trial, the right to a jury trial, and the right to the effective assistance of counsel. *Id.* §§ 841.061(b), (d), 841.144 (West 2017).

To receive a civil commitment order, the State must show beyond a reasonable doubt that the person (1) is a repeat sexually violent offender, and (2) suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *Id.* § 841.003 (defining "sexually violent predator"), § 841.062(a) (West 2017) (imposing a "beyond reasonable doubt" burden of proof). The jury's verdict must be unanimous. *Id.* § 841.062(b).

### 2. The terms of civil commitment

If the factfinder determines that the person is a sexually violent predator, the trial court must enter a civil commitment order. *Id.* § 841.081(a) (West 2017). But before entering the order, the trial court may impose certain requirements, including requirements that the person reside where instructed by the Texas Civil Commitment Office (TCCO), that the person participate in and comply with a sex offender treatment program, and that the person submit to tracking and any other appropriate

9

supervision. *Id.* § 841.082 (West Supp. 2017). When the civil commitment order is entered, it becomes immediately effective, and treatment and supervision will begin once the person is released from a secure correctional facility. *Id.* § 841.081.

When the person is released from TDCJ's custody, TCCO bears responsibility for providing the appropriate and necessary supervision and treatment. *Id.* § 841.007 (West 2017). TCCO accomplishes this through a tiered program that provides the opportunity for the person to transition from a total confinement facility, to less restrictive housing and supervision, and then to an eventual release from commitment, depending on the person's behavior and treatment. *Id.* § 841.0831 (West 2017). TCCO is required to transfer the person to less restrictive housing and supervision if doing so is in the best interest of the person and conditions can be imposed to adequately protect the community. *Id.* § 841.0834 (West Supp. 2017). But TCCO may also transfer the person back to a more restrictive tier if it later determines that such a transfer is necessary for further treatment and to protect the community. *Id.*

### 3. Review of commitment

Any order of civil commitment must be periodically reviewed. If a civilly-committed person does not petition for his release sooner, the statute requires a "biennial" examination. *Id.* §§ 841.101–.102, .121 (West 2017). In this process, the trial court judge reviews an updated report prepared by an expert regarding the committed person's status. *Id.* § 841.102. After reviewing the expert's report, the trial

court may either issue an order concluding the review or set a hearing for the purpose of determining whether the terms of commitment should be modified or whether probable cause exists to believe that the person's behavioral abnormality has changed to the extent that he is no longer likely to engage in a predatory act of sexual violence. *Id.* If the trial court sets a hearing to determine whether probable cause exists, this essentially becomes a de novo proceeding. *Id.*

## II. The testimony at Stoddard's civil commitment trial

Stoddard's civil commitment trial was held in July 2017. Two witnesses testified—Stoddard and Timothy Proctor, a forensic psychologist. Proctor opined that Stoddard suffered from a behavioral abnormality that made him likely to engage in a predatory act of sexual violence. Proctor based his assessment on one two-hour interview of Stoddard conducted six months earlier, Stoddard's deposition in this case, the images that were the subject of Stoddard's child pornography conviction, records about Stoddard's childhood and education, and a report from a separate evaluation conducted by Dr. Jorge Varela. According to Proctor, Dr. Varela had evaluated Stoddard first and determined that Stoddard had an unspecified behavioral abnormality.

Proctor identified a number of factors that he considered in evaluating Stoddard, including: (A) Stoddard's sexual deviancy, (B) Stoddard's denial and minimization of his conviction, (C) Stoddard's participation in sex offender treatment, (D) Stoddard's personality traits, (E) Stoddard's history of substance abuse,

11

(F) Stoddard's nonsexual offense history, (G) Stoddard's employment and relationship history, (H) Stoddard's prison disciplinary history, and (I) protective factors.

## A. Sexual deviancy

Proctor emphasized Stoddard's sexual deviancy as a "very strong" factor and spent much of his testimony addressing it. He diagnosed Stoddard with nonexclusive-type pedophilic disorder, meaning that Stoddard was sexually attracted to male and female children and adults.

Proctor explained in his testimony that his diagnosis of Stoddard was centered upon Stoddard's 2004 sex-offense convictions. In Proctor's view, Stoddard's possession of child pornography before his commission of sexual acts with the children was significant as it indicated his heightened sexual interest in children. The subsequent escalation of the abuse from possession of child pornography concerned Proctor. He described the escalation of Stoddard's perversion from possessing, and presumably viewing, child pornography, to grooming Alice and Bobby, to repeatedly abusing Alice, and finally to abusing Bobby and forcing them to perform sexual acts on each other. According to Proctor, "[W]hen an offender uses grooming [or] has shown a history of grooming children, that shows a history of going forward."

Proctor also emphasized Bobby's gender and the children's lack of a familial relationship to Stoddard (Stoddard was not dating Linda or otherwise related to the children). According to Proctor, sex offenders that abuse males pose a greater risk of reoffending, as do offenders who prey upon children to whom they are not related.

12

**B. Denial and minimization of the offenses**

Although Proctor admitted that Stoddard's minimization and denial was "[t]he weakest certainly" of the risk factors he identified,[2] he spent much of his testimony discussing Stoddard's denial and minimization of his guilt for some of the acts that were included within the 2004 convictions.

Throughout the commitment proceedings, Stoddard denied several of the charges of sexual abuse to which he had pleaded guilty, including the allegation that he sexually abused Bobby, that he attempted anal sex with Alice, that he forced the children to perform oral sex on each other, and that he knowingly possessed child pornography. He denied grooming the children and alleged instead that someone else must have groomed them—he claimed that Alice told him that her uncle had shown her "stuff on the computer" while she was sitting in her uncle's lap.

Stoddard minimized the offenses he did admit to—his reciprocal oral sex with Alice on two occasions over a span of two days—by insisting that Alice had watched a pornographic video she found in his closet and told him "that she wanted to try that." Stoddard denied that the video Alice found was child pornography, and he denied that he showed Bobby or her any pornographic videos. And although Stoddard minimized his abuse of Alice, he did admit at trial that he knew it was wrong

---

[2]Proctor testified, "[W]hile it's something that's considered, . . . . [y]ou put much less weight on it than you think. . . . It's not as big a thing as you would think, but it is something that still has some importance and that I consider."

while he was engaging in the sexual acts, but he did it anyway. Stoddard viewed his abuses of Alice as a "mistake."

Stoddard also painted himself as a bystander to Alice and Bobby's performance of oral sex on each other, testifying,

> I probably caught them doing it four or five different times, maybe more, that I would just walk into the room, and they would be doing that. They would . . . both be naked. [Alice] would be on . . . her back, and [Bobby] would be on top of her acting like they were having sex.

According to Stoddard, he only pleaded guilty to the charge that he forced them to have sex because his attorney would not allow him to plead no contest.

Proctor viewed Stoddard's minimization and denial as concerning and as indicating that Stoddard did not understand his offenses and that he lacked self-awareness, remorse, and empathy. Proctor emphasized Stoddard's behavior of placing the blame on Alice as the instigator and viewed it as a reason to question Stoddard's version of the events.

Proctor was also concerned by Stoddard's minimization of his possession of approximately 110 images of child pornography. Stoddard admitted that he had child pornography on his computer but claimed that he had accidentally downloaded it when viewing animated cartoons and could not remove it from the computer. However, later in his testimony, Stoddard admitted that it was possible he visited child pornography websites at some point. According to Proctor's review of the images,

14

Stoddard had possessed them for at least three years, indicating to Proctor a "persistence" of Stoddard's interest.

## C. Sex offender treatment program

Proctor admitted that pedophilia is treatable, although not curable. By the time of trial, Stoddard was about halfway through a nine-month sex offender treatment program in prison. Proctor testified that Stoddard did not do well in the beginning of treatment and struggled to commit to the treatment. After that, Stoddard began to get better and the treatment notes were positive. Near the time of trial, though, there were notes that concerned Proctor—notes about missing a session without an excuse, not taking responsibility for missing a session, being nervous and preoccupied by the commitment proceedings, and minimizing things like his child pornography possession.

Proctor identified Stoddard's treatment successes, like Stoddard's partial admission to his abuse of Alice. Although Proctor still identified Stoddard's minimization and denial of the offenses as a stumbling block to making progress in treatment, he viewed Stoddard's admission as a sign that Stoddard was open to treatment. He also recognized the significance of Stoddard's ability and willingness to identify his "high risk situations" in his deposition. At trial, Stoddard identified his high risk situation and triggers as being in the presence of "a naked child wanting to have sex with [him]."

Proctor also discussed his concerns with Stoddard's treatment progress, such as his inability to verbalize an understanding of his offense cycle and his struggle to present his "layout" in his treatment group, which was used to "report[] his history and where he's coming from." Proctor admitted that Stoddard may not have learned these things yet in his treatment but said he "would be surprised" if he had not. Proctor expressed his view that Stoddard displayed "problems with insight, and . . . some general indicators of some problems with progress again."

While Proctor also noted that Stoddard had broken treatment rules by masturbating, he admitted that it was significant that Stoddard self-reported his violation of the rules.

Finally, Proctor cautioned that even if Stoddard finished his sex offender treatment program, it may "lower his risk [of reoffending] a small amount[ but] it would not lower it to the amount that would change [Proctor's] opinion about him having a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence." Stoddard himself also acknowledged in his trial testimony his need for the sex offender treatment program and for more counseling, and he admitted that he had a problem dealing with sex.

### D. Antisocial traits and testing results

Proctor did not diagnose Stoddard with antisocial disorder or psychopathy, but he testified that Stoddard exhibited antisocial and psychopathic traits. He explained that Stoddard's antisocial traits meant he was prone to "breaking rules, not following

through with obligations, doing things that are impulsive or aggressive, being dishonest." He described an example of an "antisocial lifestyle" as "somebody who's not living a stable law-abiding kind of life. They're somebody who's not following the rules and regulations, getting into trouble, kind of bouncing around, not stable in their social life, their work life, that kind of thing." As for psychopathy, Proctor described it as a "severe type of antisocial personality" that is frequently seen in a criminal setting.

Antisocial disorder is relatively common in criminal populations—Proctor testified that "maybe up to 75 percent of people in jail or prisons are antisocial." He estimated that "like 20 percent or so" of the criminal population have psychopathy "or at least strong psychopathic traits."

Proctor explained his use of two actuarial tests as part of his process: the Static-99 and the Psychopathy Checklist Revised (PCLR).

The Static-99 is a form with ten research-based, objective risk factors indicative of a person's risk of sexual offending.[3] The factors include the person's age, their prior sex-offense convictions, prior nonsexual offense convictions, abuse the person

---

[3]Proctor also used an instrument called the Risk of Sexual Violence Protocol (RSVP) to administer the Static-99. He described it as another list of risk factors to take into consideration but differentiated it from the Static-99 on the basis that the RSVP is not an actuarial test. For convenience and based on how it is discussed in the record, we will refer to Proctor's observations from the RSVP as part of his overall observations drawn from his administration of the Static-99.

suffered as a child,[4] and characteristics of their victims such as their relationship to the person and whether they were males. Each factor is assigned a point value.

According to Proctor, a "typical score" for a sex offender outside of Texas is a two, and a "typical score" for a sex offender in Texas is a three. He scored Stoddard as a four and testified that this placed Stoddard into the "above average risk range." Proctor admitted that Dr. Varela scored Stoddard as a three. Although Proctor disapproved of the practice of assigning a percentage to the predicted recidivism rate corresponding to a Static-99 score, he admitted that a person such as Stoddard who scored a four is generally considered to have a recidivism rate of 5.5 percent.

Proctor used the PCLR to assess whether Stoddard was a psychopath. That test uses 20 personality traits to assign a number on a 40-point scale. According to Stoddard, a psychopath generally scores a 30 or higher and an "average" person's score would be lower than 10. Proctor scored Stoddard as a 27. Proctor admitted on cross-examination that the PCLR is a better indicator of general recidivism than of sexual offense recidivism.

### E. Substance abuse

Proctor cited Stoddard's "significant history of substance abuse, particularly marijuana and cocaine" as another risk factor. According to Proctor, Stoddard

---

[4]In administering the Static-99, Proctor learned that Stoddard was sexually abused as a child. Stoddard explained at trial that when he was eight, his ten-year-old male cousin engaged in oral sex with him. Stoddard described it as "experimental."

18

admitted that he was a "significant substance user for a long time" and that it "caused a lot of problems in his life" and particularly in his relationships.

However, Stoddard's substance abuse habit was well under control by the time he committed the 2004 offenses, a fact Proctor acknowledged. According to Stoddard, he last used drugs in 1984 and last used alcohol in 1994. Stoddard testified that he had attended Narcotics Anonymous (NA) for his drug problems and that he attended Alcoholics Anonymous (AA) "pretty much every day" before he went to prison. Despite the time that had passed since Stoddard's use of drugs or alcohol, Proctor insisted that his history of substance abuse was still significant because "it disinhibits" people and "brings out things" and "loosens people up."

### F. Nonsexual offenses

Proctor testified that he considered Stoddard's nonsexual criminal history, including unadjudicated offenses. Proctor explained, "Having a prior criminal history in general increases your risk of sex offending," and he testified that he considered unadjudicated offenses because "what we know about sexual offending is a lot of it goes undetected."

According to Stoddard, he had been arrested 10 to 12 times as an adult but had never spent time in prison until he was convicted of the sex offenses in 2004. He acknowledged that his first run-in with police, an incident that Proctor also mentioned in his testimony, took place when he was 10 (he was 52 at the time of trial) when he

19

shot a neighborhood girl in the leg with a pellet gun because she was beating up his brother. He believed that he was ordered to perform community service as a result.

Proctor testified that Stoddard had a history of domestic-violence assaults, theft of a vehicle, and drug charges; Stoddard's summary of his criminal history was similar. Stoddard testified that he was twice arrested for family-violence assault against his wife, who he said was bipolar. Proctor identified this assaultive behavior as a risk factor for reoffending.

Proctor also testified that Stoddard had previously violated probation and that this was significant in displaying Stoddard's inability to control his behavior, but Stoddard denied ever having had a term of probation revoked.

## G. Employment and relationship history

Proctor also considered Stoddard's "[v]ery unstable" employment history. He admitted that Stoddard said he had one job for several years—Stoddard testified he held a construction job for nine years—but Proctor also testified that Stoddard said that "in the case of a lot of jobs, he would hold the job for a while and then either leave or get fired." Proctor testified that a person with an unstable employment history was more likely to reoffend.

Proctor also considered Stoddard's "unstable" relationship history and noted Stoddard's "issues with domestic violence, wives and girlfriends making various kinds of accusations against him," some of which Stoddard admitted were true. Proctor also noted his concern about Stoddard's relationships and association with other

20

people that "are engaging in substance use and criminal behavior," although he did not identify any such people with whom Stoddard was supposedly associated.

Proctor testified that Stoddard lacked an adequate support system and viewed this as another risk factor. Stoddard testified that he would rely upon NA, AA, and continuing sex offender treatment for support once he was released.

## H.  Behavior in prison

Proctor addressed Stoddard's "institutional adjustment," or behavior in prison. He noted that Stoddard had been disciplined but was "far from the worst" Proctor had seen. On cross-examination, Proctor admitted that Stoddard's disciplinary history in prison was comprised of minor violations like leaving things out of place or leaving a plug in a wall. He admitted that it was "very rare" to find an offender that had no disciplinary history in prison. However, he noted that inmates with pedophilia are generally not involved in trouble in prison because their target victims—children—are not around.

## I.  Protective factors

In addition to risk factors, Proctor identified certain protective factors that he weighed against the risk factors. One was Stoddard's age over 50 and Proctor testified that "as a group, as sex offenders get older, their risk of sex offending starts to go down." Another protective factor was his participation in sex offender treatment, although he downplayed this because it was a short program "and he is having struggles in treatment again, it appears."

21

**Discussion**

In his first two issues, Stoddard argues that the evidence is legally and factually insufficient to support the jury's conclusion that he is a sexually violent predator. Because we agree that the evidence is factually insufficient, we reverse the trial court's judgment and do not need to reach Stoddard's third issue. *See* Tex. R. App. P. 47.1.

## I. Legal sufficiency

Stoddard argues in his first issue that the evidence is legally insufficient to support the jury's verdict finding him to be a sexually violent predator. More specifically, Stoddard argues that Proctor's testimony amounts to no evidence because it is "misleading, conclusory, and speculative." We disagree.

We review sexually violent predator civil commitment proceedings for legal sufficiency of the evidence using the appellate standard of review applied in criminal cases. *In re Commitment of Short*, 521 S.W.3d 908, 911 (Tex. App.—Fort Worth 2017, no pet.). We assess the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find the statutory elements required for commitment beyond a reasonable doubt. *Id.*

To have an offender civilly committed, the State must show beyond a reasonable doubt that the person (1) is a repeat sexually violent offender, and (2) suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Tex. Health & Safety Code Ann. § 841.003 (defining "sexually violent predator"), § 841.062(a) (West 2017) (imposing a "beyond reasonable

22

doubt" burden of proof). The evidence undoubtedly qualifies Stoddard as a sexually violent offender because he has more than one conviction for a sexually violent offense—aggravated sexual assault. *See id.* § 841.003(b) (defining "repeat sexually violent offender" as a person who has been convicted of more than one sexually violent offense).

Proctor testified that he diagnosed Stoddard with pedophilia and antisocial and psychopathic traits, and that these diagnoses were part of the basis of his opinion that Stoddard suffered from a behavioral abnormality that made him likely to engage in a predatory act of sexual violence. Stoddard argues that Proctor's opinion was conclusory or speculative, but Proctor testified to his review of relevant records, his interview of Stoddard, his review of Stoddard's deposition, and his use of actuarial tests. He described the various risk factors that he considered. Proctor provided sufficient, evidence-based support for his opinion, and we therefore decline Stoddard's request to exclude Proctor's testimony from our consideration. *See In re Commitment of Cox*, No. 09-11-00100-CV, 2012 WL 759049, at *7 (Tex. App.—Beaumont Mar. 8, 2012, pet. denied) (mem. op.) (holding Proctor's expert opinion was not unsupported speculation).

Viewing the evidence in the light most favorable to the jury's verdict, we hold that it is legally sufficient to support the jury's finding and overrule Stoddard's first issue.

## II. Factual sufficiency

Although we find the evidence to be legally sufficient, we agree with Stoddard that the evidence is factually insufficient. While in civil commitment proceedings we have adopted the criminal standard for reviewing legal sufficiency of the evidence, for factual sufficiency reviews we apply the civil standard. *See Short*, 521 S.W.3d at 911. Thus, when reviewing the factual sufficiency of the evidence to support the civil commitment order, we weigh all the evidence to determine "whether a verdict that is supported by legally sufficient evidence nevertheless reflects a risk of injustice that would compel ordering a new trial." *Id.* (quoting *In re Commitment of Dever*, 521 S.W.3d 84, 85–86 (Tex. App.—Fort Worth 2017, no pet.)). We reverse only if, after weighing the evidence, we determine that the risk of an injustice remains too great to allow the verdict to stand. *Id.*

It is undisputed that Stoddard is a repeat sex offender because of his 2004 convictions. *See* Tex. Health & Safety Code Ann. § 841.003. But this does not end the analysis. Chapter 841 requires that Stoddard suffer from a behavioral abnormality that renders him a member of the *small* group of *extremely dangerous* sex offenders that require civil commitment. *See id.* § 841.001. The evidence before us does not establish that Stoddard belongs in that category of sex offenders.

### A. Criminal history

By his own admission, Proctor's evaluation centered upon the 2004 convictions—in his words, Stoddard's convictions were "very much at the heart of

24

this condition that affects his emotional or volitional capacity." Although the crimes were indisputably reprehensible, they pale in comparison to those of sexually violent predators whose commitments have been upheld.

In most cases we have surveyed, the civilly committed sexually violent predator had a history of multiple sexual offenses over an extended period of time. For example, in *Short*, over a period of six months the appellant engaged in a pattern of violent sexual assaults in which he would lure women—mostly strangers—into his car or would forcibly gain access to their apartments and then attempt to rape them. 521 S.W.3d at 912–13. On one of those occasions, he raped a woman three times in her car. *Id.* at 913. Then, when she faked an asthma attack and claimed that she needed to go to the hospital, he began driving to the hospital but then pulled over to the side of the road, raped her a fourth time, hit her head against the window, and punched her in the chest. *Id.* He did eventually drop her off at the hospital, and then he wiped his fingerprints from her car. *Id.* One month after that, he asked a female employee at an apartment complex to show him a model apartment. *Id.* Once inside the model apartment, he pushed the woman into the closet, put her in a choke hold, and raped her. *Id.* In the next month, he unsuccessfully attempted to rape a coworker (she grabbed him by the testicles and fought back) and, ten days after that, followed her to her home and forced her into his car. *Id.*

In *In re Commitment of Day*, 342 S.W.3d 193, 202 (Tex. App.—Beaumont 2011, pet. denied), the 23-year-old offender had a history of abducting and sexually

assaulting at least two females in the span of four years, one of which was a 14-year-old girl he abducted at gunpoint. He also had 15 arrests and 13 convictions for other crimes, including shooting at his ex-girlfriend's new boyfriend and assaulting a police officer. *Id.* at 202. *See also In re Commitment of Williams*, 539 S.W.3d 429, 433–34, 440 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (noting pattern of "very-well-ingrained pedophilia" in offender including nine sex-related convictions and that he had committed sexual offenses against multiple victims while employed as a PE teacher at a parochial school); *In re Commitment of Gomez*, 535 S.W.3d 917, 919 (Tex. App.—Corpus Christi 2017, no pet.) (upholding commitment of offender who was convicted of five counts of aggravated sexual assault of his girlfriend's 12-year-old sister that occurred on different dates and whose probation was revoked because of sexual acts committed with his minor daughters, aged 1 and 2, on "several occasions").

The extreme nature of those offenses is consistent with the nationwide evolution of sexually-violent-predator civil commitments. Our sexually-violent-predator civil commitment proceeding structure is largely modeled after those adopted in Washington in 1990 and later in Kansas, as evaluated in the *Hendricks* decision of the United States Supreme Court. Those cases involved especially heinous, atrocious crimes. Washington enacted its policy in response to Earl Kenneth Shriner's kidnapping, rape, and sexual mutilation of a seven-year-old boy after the state's efforts to have him civilly committed were unsuccessful. *See* Wikipedia: *Earl*

26

*Kenneth Shriner.* In Kansas, Hendricks was upfront about his long, "chilling" history of sexually molesting children, which included everything from indecent exposure to sexual assault. *Hendricks*, 521 U.S. at 354–55, 117 S. Ct. at 2078.

In comparison, Stoddard had the two 2004 convictions for aggravated sexual assaults of Alice and Bobby, ages 7 and 6, and the 2004 conviction for possession of child pornography. Records indicated that the girl alleged that he forced her to perform oral sex on him 10 to 11 times; Stoddard admitted to it happening twice. He denied having sexually abused the boy, despite having pleaded guilty to that charge. And although Proctor weighed Stoddard's denial and minimization of the offenses against him, Proctor admitted that an offender's denial and minimization was the "weakest certainly" of the risk factors that he considered.

Furthermore, although these are admittedly serious crimes and classify as sexually violent crimes, it is significant that the jury did not assess Stoddard even close to the maximum sentence for these crimes. Although the maximum sentence was 99 years for each of the aggravated sexual assault convictions, the jury sentenced Stoddard to 20 years for each. Tex. Penal Code Ann. § 12.32 (West 2011) (designating the punishment range for a first-degree felony as 5–99 years), § 22.021 (classifying aggravated sexual assault as a first-degree felony).

As for other criminal history, little to no evidence was offered of the timing or circumstances of other offenses. Proctor provided little detail regarding Stoddard's past arrests and convictions and relied on an incident from Stoddard's childhood

27

when, at age 10 (he was 52 at the time of trial), he shot someone in the leg with a pellet gun who was beating up his brother. And while, according to Proctor, Stoddard had past convictions for domestic violence offenses, a probation revocation, theft of a vehicle, possession of drug paraphernalia, "vehicle-related violations kind of dealing with irresponsibility," "a lot of substance-related things," and "[p]roperty damage," none of these were sex offenses, no dates were provided for these offenses, and no judgments of conviction were admitted into evidence. Stoddard, on the other hand, testified that he had been convicted of "unlawful use of a vehicle, assault, under the influence of drugs," and had been arrested approximately twice for family-violence assault against a bipolar ex-wife. He also denied serving any time in prison for any of his past nonsexual offenses.

This sparse evidence of Stoddard's criminal history is distinguishable from that at issue in *Short* and *Day*. Unlike the criminal histories in those cases, Stoddard's criminal history does not establish a pattern of violent offenses, whether sexual in nature or not. When we view his criminal history in light of the weak evidence of other factors considered by Proctor, it is simply not enough to qualify Stoddard as one of the "*extremely dangerous*" sex offenders for whom these civil commitments are intended.

## B. Mental illness diagnoses and substance abuse disorder

Proctor's admission that "maybe up to 75 percent of people in jail or prisons are antisocial" undermines any assessment that Stoddard, whom Proctor diagnosed as

28

simply having antisocial "traits," is part of the "*small* but *extremely dangerous*" group of sex offenders who qualify as sexually violent predators worthy of civil commitments. *See* Tex. Health & Safety Code Ann. § 841.001 (emphasis added).

Likewise, Proctor testified that Stoddard scored a four on the Static-99 test and acknowledged that this was only one or two points above the typical score of most sex offenders. This further indicates that Stoddard did not fall into the *small* group of extremely dangerous sex offenders. *See, e.g.*, *In re Commitment of Bohannan*, 388 S.W.3d 296, 301 (Tex. 2012) (noting offender scored a five on Static-99, meaning "moderately high risk"), *cert. denied*, 569 U.S. 1009 (2013); *Day*, 342 S.W.3d at 203 (noting offender scored a six on Static-99); *In re Burnett*, No. 09-09-00009-CV, 2009 WL 5205387, at *3 (Tex. App.—Beaumont Dec. 31, 2009, no pet.) (mem. op.) (noting offender scored an eight and was therefore a "high risk" for reoffending).

Nor did Proctor diagnose Stoddard as a psychopath. Proctor scored Stoddard as a 27 on a PCLR test (a psychopathy checklist), three points below the cutoff to be considered a psychopath. *Cf. In re Commitment of Conley*, No. 09-10-00383-CV, 2011 WL 4537938, at *2 (Tex. App.—Beaumont Sept. 29, 2011, no pet.) (mem op.) (noting Proctor's testimony that offender scored a 30 on PCLR, classifying him as a psychopath, an "extreme type of antisocial personality"). Proctor estimated that "like 20 percent or so" of the criminal population has psychopathy "or at least strong psychopathic traits," and yet he did not classify Stoddard as one of those inmates.

Finally, Proctor's diagnosis of substance abuse disorder and claim that this heightened the risk that Stoddard would be more likely to act on inappropriate impulses is unconvincing. Proctor purported to make a contemporaneous diagnosis of substance abuse disorder, despite the absence of evidence that Stoddard had used alcohol or drugs in more than two decades. The only evidence in this record as to Stoddard's drug and alcohol use established that he had stopped using drugs almost 20 years before committing the sex offenses in 2003, and that he had stopped using alcohol almost 10 years before. Contrary to Proctor's assessment, Stoddard's uncontroverted testimony to his sobriety since 1994—and his participating in AA and NA—demonstrated an ability to control himself and to successfully participate in treatment.

### C. Sex offender treatment program

Proctor acknowledged that research has shown treatment is effective in reducing the risk of sex offending and in treating pedophilia. But he minimized Stoddard's participation in a sex offender treatment program, partly because he felt it was a short program (it was a nine-month program). Proctor noted that it was significant that Stoddard could not identify his triggers or verbalize an understanding of his offense cycle, but also acknowledged that he based his opinion on information obtained when Stoddard was only partly through the program. And although Proctor expressed concern that Stoddard failed to exhibit an appropriate amount of remorse

and empathy, he also admitted on cross-examination that denial and minimization is considered the "weakest certainly" of the risk factors he considered.

Additionally, the trial court did not allow Stoddard to testify that he must complete sex offender treatment before being released on parole. This ruling is the subject of Stoddard's third issue on appeal, an issue we need not decide in light of our holding that the evidence is factually insufficient. *See* Tex. R. App. P. 47.1. But we note that the State opened the door to this evidence by emphasizing, through Proctor's testimony, Stoddard's failure to complete treatment as a reason to civilly commit him. Basic math tells us that it was impossible for Stoddard to have completed a nine-month treatment program that he was only permitted to start six months prior to trial. In the very least, this consideration weakens Proctor's assessment of Stoddard's failure to complete treatment as a factor weighing in favor of commitment.

## D. Other factors

Other factors considered by Proctor included Stoddard's "[v]ery unstable" employment history, unstable relationship history, and problems with "planning." His testimony on this point was even more troublesome than his sketchy description of Stoddard's nonsexual criminal history. With regard to employment, relationship and "planning" history, Proctor provided no detail or context for his conclusory assessment of Stoddard's deficiencies in these three areas.

## Conclusion

There are currently 141,590 inmates incarcerated in Texas prisons. *See* Texas Tribune, *Texas Prison Inmates*, www.texastribune.org/library/data/texas-prisons (last visited Sept. 13, 2018). Of the convictions for which those inmates are serving time, at least 38,025 were sexually violent offenses. Texas Tribune, *Crimes*, www.texastribune.org/library/data/texas-prisons/crimes (last visited Sept. 13, 2018). To hold that Proctor's testimony—which by his own admission centered upon the 2004 convictions themselves—provided the necessary evidence to show, beyond a reasonable doubt, that Stoddard should be considered one of the "*small but extremely dangerous*" sex offenders for which civil commitments are warranted, would open the door to civil commitment of most—if not all—sex offenders who are currently incarcerated and serving the sentences imposed upon them for their crimes. It would open the door to potential abuse by allowing the State a second bite at the apple when a jury imposes a lighter sentence than the State sought for the underlying crime. Because liberty issues with serious constitutional implications are present with regard to these proceedings, the legislature has found that civil commitments should target only those sex offenders who "have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities," rendering them "likely to engage in repeated predatory acts of sexual violence." Tex. Health & Safety Code Ann. § 841.001. The State having fallen short of this standard in its proof at trial, the risk of injustice compels our ordering a new trial. *See Dever*, 521 S.W.3d at 85–86.

Having sustained Appellant's second issue and having held that the evidence is factually insufficient to support the trial court's order civilly committing Stoddard, we reverse the trial court's judgment and remand the case to the trial court for a new trial. *See Day*, 342 S.W.3d at 213 ("[I]f in the view of the appellate court weighing the evidence, the risk of injustice remains too great to allow the verdict to stand, the appellate court may grant the defendant a new trial.").

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: September 27, 2018