

NUMBER 13-19-00093-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**IN RE THE COMMITMENT OF ROBERT FLORES**

**On appeal from the 148th District Court
Of Nueces County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Perkes
Memorandum Opinion by Justice Longoria**

Robert Flores, appellant, was found to be a sexually violent predator (SVP) by a unanimous jury. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–.153. The trial court signed a final judgment and an order of civil commitment. *See id.* § 841.081. By five issues, Flores contends that: the evidence is legally and factually insufficient to support a finding that Flores has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence (issues two and three); the trial court erred by not allowing Flores's expert to express an opinion in "more understandable terms" (issue one); the trial

court erred in granting a partial directed verdict (issue four); and the trial court erred in refusing Flores's requested jury charge (issue five). We affirm.

## I. BACKGROUND

In July 2004, Flores pleaded guilty to the offense of sexual assault of a child and was sentenced to five years' incarceration in the Institutional Division of the Texas Department of Criminal Justice (TDCJ). *See* TEX. PENAL CODE ANN. § 22.011(a)(2). In August 2015, Flores pleaded guilty to the offense of indecency with a child and was sentenced to five years in the TDCJ. *See id*. § 21.11. While incarcerated for his second offense, the State, appellee, filed its petition to have Flores declared an SVP under the SVP Act, alleging that Flores was a repeat sexually violent offender who suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.003(a).

At trial, Dr. Stephen Thorne, a licensed psychologist, testified that he evaluated Flores for a behavioral abnormality, and based on his education, training, experience, and the forensic psychological methodology that he used in this case, it is his expert opinion that Flores suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.

Thorne explained that a behavioral abnormality is "a congenital or acquired condition[,] that by affecting a person's emotion[al] or volitional capacity[,] predisposes that person to commit a sexual[ly] violent offense to the extent they become a menace to the health and safety of another person." In his career, he has performed this type of evaluation between 225–250 times. In this particular case, he was called upon by the TDCJ to conduct an evaluation of Flores. In order to conduct his evaluation, Thorne

2

testified that he reviews the records provided, speaks with the individual, does a clinical review, and performs different psychology or actuarial testing. For his evaluation of Flores, he met with Flores once and he reviewed Flores's TDCJ records, police reports, court records relating to prior convictions, medical records, Flores's deposition testimony, forensic interviews of the victims, and the deposition of Flores's expert, Dr. Marisa Mauro.

In making his determination that Flores has a behavioral abnormality, Thorne looked for risk factors and protective factors that indicate how likely a person is to reoffend in the future. According to Thorne, research has shown that the two "big" areas to consider when looking at risk factors are: sexual deviancy and antisocial behavior. Thorne testified that sexual deviance "in general" is "when you engage in sexual behavior that is harmful to yourself or to others, that violates the rights of others." Thorne did not diagnose Flores with pedophilic disorder, though based on his sexual offenses against a fourteen-year-old girl and a seven-year-old girl, Thorne did diagnose Flores as a sexual deviant. Thorne noted that after the first offense, while Flores was incarcerated, he attended—but did not complete—a sex offender treatment program, and he still reoffended after he was released. Thorne further opined that Flores is an SVP not just because he committed multiple sexual offenses, but also because there are certain characteristics that are "more associated with the person reoffending than others." In regard to Flores's first offense in which he pleaded guilty to sexual assault of a child, Thorne indicated that a fourteen-year-old underage victim, the presence of alcohol, and the extrafamilial victim are all statistical risk factors in reoffending. In Thorne's evaluation of Flores, Flores's account of what happened with his first offense was not the same as the victim's account. While the victim, the daughter of the woman Flores's father was dating, expressed that Flores raped her,

3

Flores stated that the initial sexual contact was consensual, but that the girl told him to stop and he did not listen. Thorne stated that Flores was not taking full responsibility for his actions.

Thorne further testified that a significant risk factor is that Flores reoffended after being convicted and punished for his first offense. At age twenty-nine, Flores was again convicted of a sexual offense against a child. This offense involved a seven-year-old child, the daughter of Flores's wife. Again, Flores gave a significantly different account of what happened than his victim. Flores was convicted for having the child touch his penis, however, in his evaluation with Thorne, Flores stated that he only "grabbed [the seven-year-old's] butt outside of her clothes." Thorne stated that Flores's failure to acknowledge the incident could be impeding his ability to successfully complete a treatment program. Thorne also stated that Flores's impulsivity or inability to control himself likely contributed to his reoffending.

During his sentence for his second offense, Flores attended sex offender treatment, but again was unable to complete the program, though Thorne admitted there was potential for him to complete it if given additional time. Thorne reviewed the notes of the treatment provider and stated that minimizing and denying his offenses was part of the reason Flores could not complete the treatment. Flores's inability to successfully complete sex offender treatment is also an increased risk factor for reoffending.

Thorne stated that there is nothing that Flores "can point to that says [he's] changed." Some protective factors include age and completion of sex offender treatment, but neither of these apply to Flores. Thorne also discussed Flores's drug and alcohol use as risk factors. Flores admitted to having been under the influence when he committed

4

his first offense and admitted that he had a substance abuse issue. Thorne testified that illegal drug use can be indicative of an antisocial personality, though he did not diagnose Flores with antisocial personality disorder. While Flores demonstrated many antisocial traits, Thorne testified that he could not definitively state that Flores had the pervasive pattern before he was fifteen years old, as a diagnosis of antisocial personality disorder requires. However, Thorne testified that it was his opinion that Flores has a behavioral abnormality, unspecified, with features of antisocial personality, because he has "shown [a] pattern of antisocial behavior, a [sic] rule violation, a [sic] manipulation, deception, and he has a well-documented history of sexually deviant behavior over time against multiple underaged victims."

Thorne employed the Psychopathy Checklist-Revised (PCL-R), which is typically engaged by psychologists, to gauge Flores's level of psychopathy. Thorne initially scored Flores at 15 based on what records and information he had at the time, but testified that he has since received "a whole slew of records" that would add "three or four points" to Flores's score. According to Thorne, "[y]ou can score anywhere from 0 to a 40 on it depending on who you read. It's thought that a score of 25 up to 30 or higher is indicative of somebody being a psychopath." Based on the score Flores received, Thorne stated that it was a neutral factor that did not have a big impact on his opinion.

Thorne also scored Flores on the Static-99, which Thorne testified is an actuarial instrument to estimate the risk of being convicted for a sexual offense in the future. Flores scored a three, though he acknowledged that Flores had been scored a four by others, and he would not disagree with that assessment. Thorne testified that a score of three or four indicates Flores is more likely to reoffend as compared to a "typical sex offender."

5

The lowest possible score on the Static-99 is negative three, with the highest possible score being twelve.

Thorne testified as to some protective factors as well, which are indicative of a lower risk of reoffending. Flores did not have a history of victimizing strangers, he has some family and social support, and he has the ability to maintain a job, though Thorne commented that Flores has yet to show that ability. While these do not increase his risk to reoffend, Thorne does not believe they decrease his risk either, as he has already reoffended with the same positive factors in place.

Dr. Michael Arambula, a medical doctor board certified in general and forensic psychiatry, testified that he has evaluated approximately 150 sex offenders to determine if they have a behavioral abnormality, all of which have been requested by the Special Prosecution Unit of the TDCJ. Of the 150, he has found that sixteen or seventeen individuals did not have a behavioral abnormality. Based on his review of the records and his evaluation, he found that Flores suffers from a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence. Arambula testified that he reviewed the same kind of records and documents reviewed by Thorne. The time period the records covered began in Flores's youth. Arambula also interviewed Flores as part of his forensic evaluation. Based on his review of the records available to him and his interview of Flores, he found that Flores was sexually deviant, which "infers that somebody has something that's abnormal or pathologic regarding their sexual interests, their arousal satisfaction."

Arambula noted that Flores's two sexual offenses differed in types of sexually deviant behaviors, the first being a fourteen-year-old girl, likely more developed as a woman, and the second being a young child. Arambula does not just look at an

6

individual's convictions as part of his assessment, but rather he "evaluate[s] symptoms and behavior of people." Arambula reiterated the views of Thorne when he explained that it was important for Flores to admit to the details of his offenses, not just admit that they occurred, in order to learn from his past behavior. Flores's inability to successfully complete either of the two treatment programs he attended is an indicator that he is at risk to reoffend. Arambula testified that Flores currently lacks the tools necessary to control his sexual deviance in the outside world. Arambula's testimony was similar to that of Thorne's regarding Flores's juvenile misbehavior, antisocial traits, and deviancy.

Arambula did not administer the Static-99 or the PCL-R tests, as he is not trained to administer them. His research findings "allow [him] to look at these risk factors and to determine their clinical weight, so to say, in looking at the seriousness of a person's condition, which then sets the stage for recidivism in a way." Further, Arambula did not test Flores's brain function; rather, he performed an assessment of Flores's mental status.

Flores also testified at trial. He stated that he dropped out of school in the ninth grade and first got in legal trouble when he was fourteen years old for transporting illegal immigrants over the United States–Mexico border. He stated that he has never been diagnosed with depression, though he self-diagnosed himself with depression in or about 2004. He has never had suicidal thoughts, though he admitted that he lied about having suicidal thoughts in order to get out of prison during his incarceration for his first sex offense. Flores was eleven years old when he began to experiment with drugs and alcohol, and approximately thirteen years old when he began to sell drugs. He admitted to having "a problem" with both drugs and alcohol, and that he took a course called "Changes" during his current incarceration to address his issues.

Flores stated that his first sexual encounter was when he was eleven years old and that he has had close to 200 sexual partners. While he agreed that his first offense involved a sexual encounter with a fourteen-year-old girl, he did not agree that he raped her in the way the victim described. Flores did not see an issue with him being eighteen having sexual intercourse with a fourteen-year-old; he only believes it was wrong "[b]ecause she said no and I said yes." Flores also testified regarding his second sexual offense, admitting that he touched the seven-year-old girl for his own sexual gratification. Again, while he did not agree with the State regarding how the incident occurred, he admitted that he touched the child.

On direct examination, Flores discussed his relationship with his father, and explained that his father left the family and he was never able to reconnect with him, setting a bad example for Flores. Flores has a son, and he believes he has not set a good example for his own son, though he believes he has a good relationship with him. He stated that he regrets his actions toward both victims and that he has learned a lot from treatment on how to avoid these situations in the future. He testified that while he has been incarcerated for the second offense, he has realized that he needs to "break that circle" of reoffending. At the time of trial, he believed that he was still in good standing with his therapy for sex offender treatment. He expressed that he did not plan to reoffend and did not plan to be incarcerated again. He testified that he will no longer be taking drugs and intends to attend treatment programs once he is released. He further believes that his support system through his family will keep him from reoffending.

Dr. Marisa Mauro, a psychologist testifying as a defense expert, was the only witness called by Flores. Mauro was previously licensed as a sex offender treatment

provider, and though her license is inactive now, she stated that she keeps herself up to date on the latest sex offender research. She currently has her own private practice, specializing in forensic examinations, including behavioral abnormality cases. She has done approximately 200 behavioral abnormality evaluations, in which she estimates that she found that 70 percent had a behavioral abnormality. According to her understanding, a behavioral abnormality is "a congenital or acquired condition by affecting a person's emotional or volitional capacity predisposes [sic] them to commit a sexually violent offense to the extent that they become a menace to the health and safety of another person."

In order to conduct her evaluation, Mauro explained that she relied on the entirety of the statute related to SVPs. Mauro used a "clinically adjusted actuarial approach," essentially looking at risk assessments to determine if Flores suffered from a behavioral abnormality. She reviewed the records, conducted an interview with Flores, and completed a Static-99R, Static-2002R, and PCL-R to form her opinion. She discussed Flores's two convictions for sexually violent offenses. Based on her evaluation, she opined that Flores does not suffer from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.

Mauro diagnosed Flores with cannabis use disorder in a controlled environment, cocaine use disorder in a controlled environment, alcohol use disorder in a controlled environment, and other specified personality disorder with antisocial traits. Mauro believes that Flores has "antisocial traits" but he does not "predictably respond in an antisocial way to the environment." She further testified that Flores does not have a persistent abnormal pattern of sexual arousal or behavior.

9

In order to assess whether Flores was a psychopath, she employed the PCL-R, a psychopathy checklist. She explained that

> Traditionally, psychopathy might get them defied [sic] on this measure when somebody reaches this score of 30. Scoring is from zero to 40. He has a 14. In my opinion, he's not psychopathic. So further in my opinion, I do not believe that psychopathy is something in this particular case that will—that he needs to be looked at for risk. I don't think that he has psychopathy. So as compared to other people who do have psychopathy, it makes him less risky [sic] to sexually reoffend.

Mauro also employed the Static-99R and Static-2002R to measure Flores's future risk of sexual offending. She scored Flores as a four on the Static-99R and a six on the Static-2002R. Mauro explained that the most common score for a sex offender on the Static-99R is a two, meaning Flores would have "about twice the risk of your typical sex offender." However, she explained that "89 percent of the people with a score of four would not reoffend in a five-year period." Flores's score of six on the Static-2002R is similar in that it is twice as high as a typical sex offender but does not necessarily indicate reoffending within a five-year period. Outside of the Static-99R and Static-2002R, there are other risk factors to consider such as: whether an individual has a paraphilia personality disorder, specific antisocial personality disorder, and substance use at the time of the offenses. Mauro did find that Flores has a personality disorder with some antisocial traits and acknowledges that substance use was part of both of his offenses. She further noted that she was aware that he had a history of poor prognosis in sex offender treatment, but that if he completes the current treatment he is in, it would be a protective factor in his favor. Mauro spoke with Flores's treatment provider and learned that Flores was expected to complete treatment, if a request to extend his treatment was confirmed, but it was noted that he still had some issues with denial. Mauro does not

10

consider Flores to have failed the second sex offender treatment program.

Additionally, Mauro found that Flores's lack of paraphilia personality disorder is an important neutral factor. She does not believe that having antisocial traits, as she has found with Flores, is the same as having antisocial personality disorder. She agrees that both of his prior convictions were acts of sexual deviancy and that if he were to engage in alcohol or drug use, it would increase his risk of reoffending.

The jury found Flores to be an SVP beyond a reasonable doubt. The trial court ordered that upon release from the TDCJ, Flores should be immediately transported "by a representative of the Texas Civil Commitment Office to a contracted residential facility" where he will "participate and comply with the sex offender treatment program provided by the office, and shall comply with all the written requirements imposed by the office." Final judgment and an order of commitment were entered on December 6, 2018. Flores filed a motion for new trial on December 21, 2018, which was overruled by operation of law. This appeal followed.

## II.    SUFFICIENCY OF THE EVIDENCE

In his second and third issues, which we address first, Flores contends that there was legally and factually insufficient evidence to support a finding beyond a reasonable doubt that he has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.

## A.    Standard of Review and Applicable Law

We review sexually violent predator civil commitment proceedings for legal sufficiency of the evidence using the appellate standard of review applied in criminal cases. *In re Commitment of Short*, 521 S.W.3d 908, 911 (Tex. App.—Fort Worth 2017,

no pet.). We assess the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find the statutory elements required for commitment beyond a reasonable doubt. *Id.*

"When reviewing the factual sufficiency of the evidence to support a civil commitment order, we weigh all the evidence to determine whether a verdict that is supported by legally sufficient evidence nevertheless reflects a risk of injustice that would compel ordering a new trial." *Id.* We do so by viewing all of the evidence in a neutral light and asking whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *See In re Commitment of Day*, 342 S.W.3d 193, 206 (Tex. App.—Beaumont 2011, pet. denied).

Chapter 841 of the Texas Health and Safety Code (the SVP Act) provides a procedure for the involuntary civil commitment of a sexually violent predator. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–.153; *see also In re Commitment of Hull*, No. 13-17-00378-CV, 2019 WL 3241883, at *1 (Tex. App.—Corpus Christi–Edinburg July 18, 2019, pet. filed) (mem. op.) (detailing the background and purpose of SVP statutes in Texas). A person can only be civilly committed if the factfinder determines, by a unanimous verdict and beyond a reasonable doubt, that the person is an SVP. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.062, 841.081. An SVP is a person that (1) is a repeat sexually violent offender, and (2) suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *Id.* § 841.003(a). A person is a repeat sexually violent offender if the person is convicted of more than one sexually violent offense and a sentence is imposed on at least one of those convictions. *Id.* § 841.003(b). A behavioral abnormality is defined as "a congenital or acquired condition

12

that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2).

The Legislature did not define "likely" in the context of the SVP Act. When a term is not defined by statute, we typically give that term its ordinary meaning, unless a different or more precise definition is apparent from the context of the statute. *State Office of Risk Mgmt. v. Carty*, 436 S.W.3d 298, 302 (Tex. 2014) (*quoting TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011)). The Texas Supreme Court, in considering the different language of "likely to engage in a predatory act of sexual violence" and "predisposes the person to commit a sexually violent offense," stated that "the import of predisposition and likelihood is exactly the same: increased risk." *In re Commitment of Bohannan*, 388 S.W.3d 296, 303 (Tex. 2012). The court further stated, "An increased likelihood of misconduct indicates a predisposition, and a predisposition threatens increased likelihood." *Id*. The court thus concluded that "whether a person 'suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence' is a single, unified issue." *Id*. (quoting TEX. HEALTH & SAFETY CODE ANN. § 841.003(a)(2)); *see also In re Commitment of Williams*, 539 S.W.3d 429, 439 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

## B. Analysis

Flores does not challenge the first prong of the SVP act.[1] His challenge to the legal sufficiency of the evidence argues that "the [S]tate experts incorrectly defined behavioral

---

[1] Flores challenges the trial court's granting of a directed verdict on the first prong of the SVP act, but he does not allege that there was a fact issue relating to the first prong, he only argues that a directed verdict had a negative influence on the jury. This issue is addressed below.

13

abnormality to mean just an increased risk of offending" and "assuming that these experts applied the correct legal definition of behavioral abnormality, the basis offered for their opinions that Mr. Flores has a behavioral abnormality does not support these opinions."

### 1. Legal Sufficiency

Flores's first complaint is that the State's experts incorrectly defined behavioral abnormality. In one sentence, he argues "the state experts incorrectly defined behavioral abnormality to mean just an increased risk of offending." Flores contends that the State did not prove that he is the "worst of the worst" or an "extremely dangerous" sex offender that Chapter 841 is meant to address. However, the State does not need to prove those things; instead, the State only needs to prove beyond a reasonable doubt that Flores is an SVP. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.062(a). Thus, the State needed to prove that Flores (1) is a repeat sexually violent offender, and (2) suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *Id.* § 841.003(a). Because Flores does not dispute the first prong, the only fact issue that needed to be resolved is whether Flores had a behavioral abnormality. *Id.* § 841.002(2).

"Behavioral abnormality" means a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person. *Id*. Thorne testified to the exact definition, explaining that a behavioral abnormality is a "congenital or acquired condition that by affecting a person's emotion[al] or volitional capacity[,] predisposes that person to commit a sexual[ly] violent offense to the extent they become a menace to the health and safety of another person." Arambula testified similarly,

14

Q.[The State]: Okay. And you've seen the definition for behavioral abnormality as defined by the Texas Health and Safety Code of the congenital or acquired condition by affecting a person's emotional or volitional capacity predisposes the person to commit a sexually wrong offense. Do you believe that Mr. Flores has this behavioral abnormality that makes him likely to engage in a predatory act of sexual violence?

A. [Arambula]: Yes, I do.

Both of the State's experts used the precise statutory definition of behavioral abnormality. Therefore, Flores's contention that neither of the State's experts used or relied on the correct definition of behavioral abnormality is incorrect. However, Flores further contends that even if the experts used the correct definition, their opinions "cannot be considered probative evidence because the basis offered for these opinions (essentially that Mr. Flores is able to control himself most of the time) does not support these opinions making them conclusory with no probative value." Bare, baseless opinions will not support a judgment even if there is no objection to their admission in evidence. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009); *see also In re Commitment of Rogers*, No. 05-17-00010-CV, 2018 WL 360047, at *5 (Tex. App.—Dallas Jan. 11, 2018, pet. filed) (mem. op.). When a scientific opinion is admitted in evidence without objection, it may be considered probative evidence even if the basis for the opinion is unreliable. *Pollock*, 284 S.W.3d at 818. But if no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, even if no objection was made. *Id*.

Flores did not object at trial that Thorne's or Arambula's opinions were unreliable, thus, to prevail on his legal sufficiency claim, he must show that the evidence offers no basis to support their opinions. *See In re Commitment of Barbee*,192 S.W.3d 835, 843

15

(Tex. App.—Beaumont 2006, no pet.).; *see also In re Commitment of Sawyer*, No. 05-17-00516-CV, 2018 WL 3372924, at *7 (Tex. App.—Dallas July 11, 2018, pet. denied) (mem. op.). Thorne is a licensed psychologist who has performed between 225–250 evaluations of the type performed in this case. He testified that he used the same methodology followed by other experts in this field. He discussed in detail the risk assessment measuring tools that he implemented in his evaluation, as well as the documents he reviewed and the interview he had with Flores. Arambula, a medical doctor board certified in general and forensic psychiatry, testified that he has evaluated approximately 150 sex offenders to determine if they have a behavioral abnormality. He also testified that his methodology aligned with other experts in this field. He explained how his review of the documents, interview with Flores, and research in the area of behavioral abnormality allowed him to form his opinion.

After reviewing the record, we conclude it supports Thorne's and Arambula's opinions and that their opinions cannot be characterized as wholly conclusory or without any foundation. *See Pollock*, 284 S.W.3d at 817; *Rogers*, 2018 WL 360047, at *6. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found, beyond a reasonable doubt, that Flores suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. The evidence is legally sufficient to support the jury's finding that Flores is an SVP. *See In re Commitment of H.L.T.*, 549 S.W.3d 656, 664 (Tex. App.—Waco 2017, pet denied). We overrule Flores's second issue.

### 2. Factual Sufficiency

In his third issue, Flores contends that the evidence is factually insufficient to

support a finding that he suffers from a behavioral abnormality. Flores compares himself to the defendant *In re Commitment of Stoddard* to argue that the evidence in this case is factually insufficient. *See In re Commitment of Stoddard*, No. 02-17-00364-CV, 2019 WL 2292981, at *1 (Tex. App.—Fort Worth May 30, 2019, pet. filed) (mem. op. on reh'g). However, we do not agree that Flores should be directly compared to Stoddard in order to determine if the evidence was factually sufficient. Each case should be evaluated on its own merits based on the governing standards of review. *Id.* at 2019 WL 2292981, at *25 n.3 (Gabriel, J., dissenting). Accordingly, we turn to the evidence presented in this case to determine if it is factually sufficient to find that Flores had a behavioral abnormality.

In his self-comparison to Stoddard, Flores contends that he has a low history of sexual offenses against children; his plea-bargain with the State resulted in reduced prison time for his offenses; he was not diagnosed with pedophilic disorder; he was not diagnosed as a psychopath; his scores on the PLC-R, Static-99R, and Static-2002R evaluations were low; he made some progress in sex offender treatment; and while he has antisocial traits, he also has protective factors. The jury heard from three experts, all of which scored Flores similarly on risk evaluation assessments, but one of which did not find he had a behavioral abnormality. The jury heard significant testimony regarding Flores's juvenile behaviors, including drug use, alcohol use, sexual relations with prostitutes, illegally transporting non-United States citizens across the United States–Mexico border, and truancy. There was testimony regarding Flores's two convictions for violent sexual offenses against a fourteen-year-old girl and a seven-year-old girl. Each expert agreed that Flores showed antisocial traits and was assessed to have a personality

17

disorder. The experts testified that his drug and alcohol use could also create instability in Flores's life. Flores admitted to having an alcohol problem but stated that his drug use was only a result of his drinking.

Weighing all of the evidence in a neutral light and applying the relevant factual sufficiency standard, we conclude that a rational jury could have found beyond a reasonable doubt that Flores was a repeat sexually violent offender who suffered from a behavioral abnormality that made him likely to engage in a predatory act of sexual violence because he had serious difficulty in controlling his behavior. *See In re Commitment of Dever*, 521 S.W.3d 84, 88 (Tex. App.—Fort Worth 2017, no pet.) (finding evidence factually sufficient where expert testified "that Dever suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence, identifying and discussing in detail the various "risk factors" that he relied upon to form and to support his opinion, including Dever's sexual criminal history, his lifestyle instability and criminality, his response to treatment or supervision, his age at onset of offending, and the presence of sexual deviance."); *Williams*, 539 S.W.3d at 440–41 (holding that evidence was factually sufficient to find Williams to be an SVP even though the Static-99R presented him with a "low-moderate" risk range where expert testified regarding his opinion based on the risk factors and his diagnosis that Williams had a behavioral abnormality). Accordingly, we do not find that the jury's verdict reflected a risk of injustice that would compel ordering a new trial. Because we find that factually sufficient evidence supports the jury's verdict that Flores is an SVP, we overrule his third issue. *See In re Commitment of Renshaw*, __ S.W.3d __, __, No. 06-19-00069-CV, 2020 WL 559292, at *8 (Tex. App.—Texarkana Feb. 5, 2020, no pet. h.).

### III.  EXPERT TESTIMONY

In his first issue, Flores argues that the trial court erred by not permitting his expert, Mauro, to "express an opinion that Mr. Flores does not have a 'behavioral abnormality' in more understandable terms." Specifically, Flores wanted to elicit testimony from Mauro "that he is not a 'worst of the worst' or 'extremely dangerous' sex offender." Flores argues that the terms "behavioral abnormality" and "worst of the worst" or "extremely dangerous" mean the same thing and Mauro should have been allowed to discuss them as such in front of the jury.

### A.  Standard of Review and Applicable Law

We review a trial court's evidentiary rulings for abuse of discretion. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012). "A trial court abuses its discretion when it acts without regard for guiding rules or principles." *Id*. Even if a trial court abused its discretion in making an evidentiary ruling, reversal is only appropriate if the error probably resulted in an improper judgment. *Id*.; *see In re Commitment of Colantuono*, 536 S.W.3d 549, 559 (Tex. App.—San Antonio 2017, no pet.); *see also* TEX. R. APP. P. 44.1.

> The legislature finds that a small but extremely dangerous group of sexually violent predators exists and that those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence.

TEX. HEALTH & SAFETY CODE ANN. § 841.001. While the legislative intent is to commit for long-term supervision those "extremely dangerous" SVPs specified, the State need only prove what the statute requires: that Flores (1) is a repeat sexually violent offender, and (2) suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.  *Id.* § 841.003(a). The State argued against the admission of

testimony relating to "worst of the worst" and "extremely dangerous" under Texas Rule of Evidence 403, stating that the testimony could have confused or misled the jury. *See* TEX. R. EVID. 403.

## B.  Analysis

At the conclusion of Mauro's testimony, Flores made an offer of proof by questioning Mauro outside the presence of the jury.[2] During this offer of proof, Mauro was asked "What does the Legislative intent of Chapter 841 indicate?" Mauro replied, "That there is a small but extremely dangerous group of sex offenders that are not amenable to traditional mental health treatment." Mauro continued on to state that the legislative intent shows that a typical sex offender is not going to fall into the group of those SVPs and specifically that the SVPs would not be amenable to traditional treatment. She then explained that she believed that Flores was amenable to traditional treatment.

Flores contends that Mauro should have been able to express that those who suffer from behavioral abnormalities are members of a small and extremely dangerous group, as that is her understanding of the legal definition. However, the definition of behavioral abnormality does not include that language. As mentioned above, "behavioral abnormality" means a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person. TEX. HEALTH & SAFETY CODE ANN. § 841.002(2).

Mauro testified, in front of the jury, that she did not believe that Flores suffered

---

[2] The State contends that Flores did not preserve this issue for our review. We disagree.

20

from a behavioral abnormality that would make him likely to commit a sexually violent offense. She explained why she reached her opinion on that and the risk and protective factors that guided her decision. She was allowed to clearly explain her position to the jury in regard to the definition of behavioral abnormality and why she did not believe Flores met the criteria.

While Flores believes it would have been "simpler and more understandable" to use the phrase "worst of the worst" in describing those with behavioral abnormalities, that testimony was objected to by the State as having the potential to be confusing or misleading to the jury. *See* TEX. R. EVID. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."). Because it is not part of the definition of behavioral abnormality, the trial court could have reasonably concluded that the additional description or language that Flores sought to present to the jury would confuse or mislead the jury into thinking the definition included these terms. Therefore, we conclude that the trial court did not err in sustaining the State's objection.

Moreover, even if the trial court erred in sustaining the State's objection, any error is harmless. *See* TEX. R. APP. P. 44.1(a)(1) (explaining that no judgment may be reversed on appeal on the ground the trial court made an error of law unless the court of appeals concludes the error complained of probably caused the rendition of an improper judgment). The jury had already heard evidence from all three experts regarding the meaning of behavioral abnormality, the risk assessments performed, and why the experts believed that Flores did or did not suffer from a behavioral abnormality. In

21

addition to having already heard evidence about behavioral abnormalities, the jury heard Mauro's expert opinion that Flores was not likely to commit another sexually violent offense. We cannot conclude any error probably caused the rendition of an improper judgment. *See id.*; *Colantuono*, 536 S.W.3d at 560.

We overrule Flores's first issue.

## IV.   DIRECTED VERDICT

By his fourth issue, Flores argues that the trial court erred in granting a partial directed verdict that Flores was a "repeat sexually violent offender."

## A.   Standard of Review and Applicable Law

"In reviewing the granting of a directed verdict, we follow the standard of review for assessing the legal sufficiency of the evidence." *Ibarra v. Nat'l Constr. Rentals, Inc.*, 199 S.W.3d 32, 37 (Tex. App.—San Antonio 2006, no pet.). "[W]e examine the evidence in the light most favorable to the person suffering an adverse judgment and decide whether there is any evidence of probative value to raise an issue of material fact on the question presented." *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217 (Tex. 2011). We review the proper construction of a statute de novo. *Hoskins v. Hoskins*, 497 S.W.3d 490, 493 (Tex. 2016). "When statutory text is clear and unambiguous, we construe that text according to its plain and common meaning unless a contrary intention is apparent from the statute's context." *Id*. at 493–94.

A person is a "repeat sexually violent offender" if the person "is convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses." TEX. HEALTH & SAFETY CODE ANN. § 841.003(b). Chapter 841 defines a "sexually violent offense" as including sexual assault and indecency with a child by

22

contact. *See id*. § 841.002(8)(A), (C) (defining "sexually violent offense" to include offenses under penal code §§ 21.11(a)(1), 22.011, and 30.02(a), (d)).

## B. Analysis

Flores does not object to the directed verdict on the ground that there was a fact issue regarding whether he was a "repeat sexually violent offender"; rather, he argues that allowing a directed verdict as to that prong of the statute "negatively influences the jury to come to an incorrect decision as essentially the Court has just rubber stamped half of the State's case." We disagree.

The rules of civil procedure permit directed verdicts. *See* TEX. R. CIV. P. 268. There was no dispute that Flores was in fact convicted of two prior sexually violent offenses. The evidence of each was presented to the jury and there was no objection when the trial court took judicial notice that each conviction was for a sexually violent offense as defined under the SVP Act. Flores's contention that the jury could have viewed the partial directed verdict as instructing them that Flores was an SVP is essentially making the argument that the trial court erred by granting the State's motion taking the issue of whether or not he is a "repeat sexually violent offender" away from the jury. Partial directed verdicts may be granted on the question whether a person is a repeat sexually violent offender because the SVP Act is civil, not punitive. *See In re Commitment of Talley*, 522 S.W.3d 742, 749–50 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *see also In re Commitment of Hood*, No. 01-16-00866-CV, 2018 WL 1633330, at *3 (Tex. App.—Houston [1st Dist.] Apr. 5, 2018, pet. denied) (mem. op.). Because the record conclusively establishes Flores's prior convictions are convictions for a "sexually violent offenses" under chapter 841, we conclude the trial court did not err by granting a

partial directed verdict on the issue of whether appellant is a repeat sexually violent offender. *See In re Commitment of Black*, 522 S.W.3d 2, 5–6 (Tex. App.—San Antonio 2017, pet. denied); *see also In re Commitment of Anderson*, No. 05-17-00769-CV, 2018 WL 3968499, at *7 (Tex. App.—Dallas Aug. 20, 2018, no pet.) (mem. op.). We overrule appellant's fourth issue.

## V.    JURY CHARGE

By his fifth and final issue, Flores argues that the trial court erred in refusing his requested jury charge instruction that would allow the jury to render a verdict in his favor "by a 10-2 vote in accordance with Rule 292(a) of the Texas Rules of Civil Procedure."

### A.    Standard of Review and Applicable Law

"We review a trial court's decision to submit or refuse to submit a particular jury instruction for an abuse of discretion." *City of Austin v. Chandler*, 428 S.W.3d 398, 413 (Tex. App.—Austin 2014, no pet.) (citing *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000)). But because a trial court has no discretion to misstate the law, we review de novo whether an instruction in a jury charge misstates the law based on improper statutory construction. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex. 2002). When interpreting a statute to determine what the law is, our primary objective is to give effect to the legislature's intent, and "the Legislature expresses its intent by the words it enacts and declares to be the law." *Bosque Disposal Sys., LLC v. Parker Cty. Appraisal Dist.*, 555 S.W.3d 92, 94 (Tex. 2018) (quoting *Molinet v. Kimbrell*, 356 S.W.3d 407, 414 (Tex. 2011)).

The statute at issue states: "A jury determination that the person is a sexually violent predator must be by unanimous verdict." TEX. HEALTH & SAFETY CODE ANN.

24

§ 841.062(b). The jury charge in this case tracked the statute.

## B.    Analysis

Flores argues that our sister courts have held that it is appropriate to instruct the jury that a "no" answer requires only ten members to agree appropriate. *See In re Commitment of Gipson*, 580 S.W.3d 476, 486 (Tex. App.—Austin 2019, no pet.); *see also In re Commitment of Garcia*, No. 03-18-00331-CV, 2019 WL 3367547, at *2 (Tex. App.—Austin July 26, 2019, no pet.) (mem. op.). In both *Gipson* and *Garcia*, the trial court included in the charge that ten votes would be sufficient to find beyond a reasonable doubt that someone is not an SVP. *See Gipson*, 580 S.W.3d at 481; *Garcia*, 2019 WL 3367547, at *2. In those cases, the State's arguments that the instructions were erroneous were overruled. In *In re Commitment of Jones*, it was argued "that the trial court erred by declining to issue a jury instruction that the jury could render a verdict in Jones's favor nonunanimously, by a vote of 10-2." *In re Commitment of Jones*, 571 S.W.3d 880, 889 (Tex. App.—Fort Worth 2019, pet. filed). The court held that it was error to decline to instruct the jury that it may render a "no" finding with ten jurors' concurrence. *Id.* at 891. We agree with these courts and find that the trial court erred by not including the requested instruction. *See id.*; *see also* TEX. R. CIV. P. 292(a) (providing generally that "a verdict may be rendered in any cause by the concurrence, as to each and all answers made, of the same ten or more members of an original jury of twelve"); *In re Commitment of Shelton*, No. 02-19-00033-CV, 2020 WL 719443, at *12 (Tex. App.—Fort Worth Feb. 13, 2020, no pet. h.) (mem. op.).

Our inquiry does not end here; to obtain a reversal of a judgment on the basis of trial-court error in civil cases, the appellant must show that the error probably caused

25

rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court. TEX. R. APP. P. 44.1(a); *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 225 (Tex. 2005). Charge error is generally considered harmful if it relates to a "contested, critical issue." *Transcont'l Ins. Co. v. Crump*, 330 S.W.3d 211, 225 (Tex. 2010) (quoting *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009)). Unless the appellate court is reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it, the error is reversible. *Romero*, 166 S.W.3d at 227–28.

In *Jones*, the court determined that there was harm because, even though the record did not demonstrate exactly how the vote among the jurors was split during deliberations, the record revealed a split definitely existed. *Jones*, 571 S.W.3d at 891. Indeed, in *Jones*, the jury issued four notes concerning the substance of the case: three requested portions of the record to review testimony of definitions of certain terms; and one, issued four-and-a-half hours after jury deliberations began, declared that the jury was deadlocked. *Id*. About an hour and fifteen minutes after the trial court delivered a modified *Allen* charge urging the jury to continue deliberating, the jury returned a unanimous verdict. *Id*. The court held that given that record, it could not be reasonably certain that the verdict was not significantly influenced by the trial court's error. *Id*.

Unlike in *Jones*, the jury in this case did not issue any notes. In short, Flores has pointed to nothing in the record, and we find nothing, indicating that the jury was split in its decision. Thus, we are reasonably certain that the verdict was not significantly influenced by the trial court's error. *See Renshaw*, __ S.W.3d at __, 2020 WL 559292, at *11 ("Unlike in *Jones*, there was no evidence of a split decision. Instead, the jury's only

26

correspondence with the trial court said that it had reached a unanimous verdict."); *cf. Jones*, 571 S.W.3d at 891; *see also Shelton*, 2020 WL 719443, at *13; *In re Commitment of Driggers*, No. 13-19-00158-CV, 2019 WL 6769878, at *9 (Tex. App.—Corpus Christi–Edinburg Dec. 12, 2019, no pet.) (mem. op.) (finding no harm where there was no evidence of a split decision).

Like the defendant in *Shelton*, Flores argues that under the guidance of the Supreme Court of New Jersey's decision in *State v. Brown*, this court should presume harm in this case. 138 N.J. 481, 509 (1994); *Shelton*, 2020 WL 719443, at *13. We agree with the court's analysis in *Shelton* that this argument is misguided:

> Not only are we not bound by decisions of other state's high courts, the Supreme Court of New Jersey overruled *Brown* in *State v. Cooper* to the extent that Brown suggested that the non-unanimous instruction was required during the guilt phase of trial, concluding that such an instruction was only required during the penalty phase of a criminal trial. 151 N.J. 326, 331 (1997). This civil-commitment proceeding is not a criminal trial, and we decline the invitation to apply nonbinding, overruled caselaw from another state.

*Shelton*, 2020 WL 719443, at *13. Accordingly, we overrule Flores's fifth issue.

## VI. CONCLUSION

The judgment of the trial court is affirmed.

NORA L. LONGORIA
Justice

Delivered and filed the
2nd day of April, 2020.

27